1

2

3

4

5

6 **UNITED STATES DISTRICT COURT**

7 **DISTRICT OF NEVADA**

8

9 RICKY DAVID SECHREST,                    )

10         Petitioner,                     )         3:92-cv-0536-ECR-WGC
                                           )
11 vs.                                     )
                                           )         **ORDER**
12 RENEE BAKER,[1] *et al.*,               )
                                           )
13         Respondents.                    )
                                           )
14 _____/

15

16 <u>Introduction</u>

17         This action is a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254,

18 by Ricky David Sechrest, a Nevada prisoner convicted of two counts of first degree murder and two

19 counts of first degree kidnapping, and sentenced to two death sentences and two terms of life in

20 prison without the possibility of parole.  Sechrest's convictions and death sentence are the result of

21 his kidnapping and murder of two young girls near Reno, Nevada, on May 14, 1983.

22         The case is before this court on remand from the Ninth Circuit Court of Appeals, with a

23 mandate that this court resolve certain claims concerning the constitutionality of Sechrest's

24 convictions.  *See Sechrest v. Ignacio,* 549 F.3d 789, 802-05 (9th Cir.2008).  In addition, the court of

25

26         [1]  Respondent Renee Baker is substituted for her predecessor, E.K. McDaniel, as Warden of Ely State Prison.  Fed. R. Civ. P. 25(d).

1   appeals has mandated that this court is to grant habeas corpus relief to Sechrest, with respect to the

2   death sentences imposed upon him. *Id*. at 807-18.

3        This court determines that habeas corpus relief is not warranted on the remanded claims

4   concerning the constitutionality of Sechrest's convictions, and the court, therefore, denies those

5   claims.  The court grants Sechrest habeas corpus relief with regard to his death sentences, as directed

6   by the court of appeals.

7   <u>Background Facts and Procedural History</u>

8        In its August 27, 1985 decision affirming Sechrest's convictions and sentence, the Nevada

9   Supreme Court described, as follows, the facts of the case as revealed by the evidence:

10       In April of 1983, Doris Schindler hired Zella Weaver to babysit her ten-year old
11  daughter, Maggie Schindler.  In addition to caring for Maggie during weekday
    afternoons and evenings at the Schindler residence, Mrs. Weaver would pick Maggie up
12  from the Meadowood Ice Arena when Maggie was through ice skating on Saturdays.

13       On May 14, 1983, a neighbor of the Schindlers' drove Maggie and her friend,
    Carly Villa, to Meadowood and dropped them off to skate.  Later that afternoon Mrs.
14  Weaver went to Meadowood to pick up Maggie and Carly but could not find them.  The
    police were notified, and an investigation was begun.

15       On June 7, 1983, the bodies of Maggie and Carly were found in Logomarsino
    Canyon, a remote area east of Reno, by two young men who were out shooting.  The
16  bodies, which had been covered with loose dirt, were found about 50 yards apart.  A pair
    of ice skates and skate guards with the name "Maggie S." on them were found near one
17  of the gravesites.

18       Ricky David Sechrest is Zella Weaver's grandson and lived at her home.
    Sechrest had been seen outside the Schindler home several times while waiting to pick
19  up his grandmother when she finished babysitting there.  The record establishes that
    Maggie had been at the Weaver residence before and that Sechrest knew that his
20  grandmother routinely picked Maggie up at Meadowood Mall on Saturdays.

21       On June 14, 1983, Sechrest gave an inculpatory statement to Officer Bogison and
    Detective Eubanks of the Reno Police Department while he was being questioned at the
22  Sparks Police Department by Sparks police on an unrelated grand larceny charge.  He
    admitted that he had picked up Maggie and Carly from the Meadowood Mall Ice Arena.
23  He said that he asked Maggie if she wanted to go for a ride and that she had agreed.
    They drove out to Logomarsino Canyon.  Sechrest claimed that they were walking
24  around the hills rock hunting when Carly fell over backward and hit her head.  Sechrest
    said he thought the girl was dead because when he checked her pulse, she did not have
25  one.  He said Maggie began to "freak out on him" and was "between hysterical and
    crying."  Sechrest stated that he knew it was wrong to be up there with the girls to begin
26  with, so when Maggie began to run he panicked, caught her and hit her over the back of
    the head with a rock.  After hitting the girl three or four more times with the rock after

2

1   she had fallen, Sechrest went to his car and got a shovel. He returned to where Carly
2   was lying and thought she was still alive; so he hit her "once or twice" in the head with
    the edge of the shovel. He then buried the girls with loose dirt. In his statement Sechrest
3   admitted that he performed an act of masturbation on Maggie's body, but, according to
    him, at this time the girl was already dead. [Footnote: At trial a forensic pathologist
4   testified that it was unlikely that Carly fell and killed herself. He also testified that the
    skull fractures in both children were probably caused by the shovel. He further testified
5   that due to the decomposition of the bodies it would have been impossible to tell if a
    sexual assault had occurred.]

6        A jury convicted Sechrest of two counts of first degree murder and two counts
     of first degree kidnapping. At the penalty phase, the jury set the penalty at death on each
7    murder conviction. In addition the trial judge sentenced Sechrest to life without
     possibility of parole on each of the two kidnapping counts.

8

9   *Sechrest v. State*, 101 Nev. 360, 362, 705 P.2d 626, 628 (1985).

10     Sechrest appealed to the Nevada Supreme Court. Exhibit 63.[2] The Nevada Supreme Court

11  affirmed on August 27, 1985. Exhibit 71; *Sechrest v. State*, 101 Nev. 360, 705 P.2d 626 (1985),

12  *overruled in part*, *Harte v. State*, 116 Nev. 1054, 13 P.2d 420 (2000).

13     On November 13, 1985, Sechrest filed a petition for post conviction relief in the state

14  district court. Exhibits 80, 92. The state district court conducted an evidentiary hearing on

15  November 8, 1990. Exhibit 95. On January 14, 1991, the state district court denied the petition.

16  Exhibit 103. Sechrest appealed, and the Nevada Supreme Court affirmed on February 20, 1992.

17  Exhibit 113; *Sechrest v. State*, 108 Nev. 158, 826 P.2d 564 (1992).

18     Sechrest filed a *pro se* habeas corpus petition, initiating this federal action on August 3, 1992

19  (docket #1). The court appointed counsel for Sechrest (docket #5, #16). On October 31, 1994,

20  counsel filed a first amended habeas petition (docket #47) on Sechrest's behalf.

21     On March 1, 1995, respondents filed a motion to dismiss, arguing that none of Sechrest's

22  claims for habeas corpus relief were exhausted in state court (docket #62). On September 26, 1995,

23  the court granted the motion to dismiss, with leave for Sechrest to amend to more specifically state

24  where and when he exhausted his state-court remedies (docket #69).

25

26      [2] The exhibits referred to in this order, unless otherwise indicated, are the exhibits filed by
    respondents, and found in the record at docket #32, #104, #135, and #197. Regarding the form of the
    court's citations to the exhibits found at docket #104 and #197, *see* footnotes 3 and 5, below.

1        Sechrest filed a second amended habeas petition on October 27, 1995 (docket #70).

2   Respondents again moved to dismiss (docket #74), arguing that Sechrest still had not shown

3   exhaustion of his state-court remedies with respect to any of his claims.  The court entered an order

4   (docket #81), on July 29, 1996, finding that Sechrest's second amended habeas petition was mixed,

5   in that it included both claims that were exhausted and claims that were not.  The court dismissed

6   Sechrest's mixed second amended petition, and judgment was entered (docket #81, #82).

7        Sechrest appealed from the dismissal of his second amended petition (docket #84). The court

8   of appeals ruled initially on August 27, 1998 (docket #93), and then amended its decision on

9   September 16, 1998 (docket #94).  The court of appeals noted that Sechrest had, after this court's

10   dismissal of his second amended petition, returned to state court to exhaust his unexhausted claims.

11   Sechrest filed a petition for writ of habeas corpus in state court on August 29, 1996.  Exhibit

12   1(104).[3]  On September 4, 1996, the state trial court dismissed the petition on procedural grounds.

13   Exhibit 2(104)M.  On November 20, 1997, the Nevada Supreme Court dismissed Sechrest's appeal

14   from that ruling.  Exhibit 3(104).

15        In the order of the Ninth Circuit Court of Appeals, as amended, the court ruled that five of

16   the claims in Sechrest's second amended petition were exhausted; the court ruled that the other

17   claims in that petition were procedurally barred.  August 27, 1998 Order (docket #93, #94).  The

18   court dismissed the appeal and remanded, directing this court to vacate the order dismissing the

19   petition, permit Sechrest to delete the claims held to be procedurally barred, and proceed to address

20   the merits of the five exhausted claims.  *Id.*

21

22

23

24       [3] On December 28, 1998, respondents filed three exhibits, designated Exhibits 1, 2, and 3, which
include documents relative to Sechrest's second post conviction petition in state court (docket #104).

25   To distinguish those exhibits from Exhibits 1, 2, and 3 filed by respondents on September 1, 1993
(docket #32), the Court refers to the exhibits filed by respondents on December 28, 1998, as "Exhibit

26   1(104)," "Exhibit 2(104)," and "Exhibit 3(104)."  Exhibit 2(104) includes subparts A through R, which
are referred to as "Exhibit 2(104)A," "Exhibit 2(104)B," etc.

1    On May 20, 1999, Sechrest filed a third amended petition for writ of habeas corpus

2  (docket #115), including in it only the five claims held by the court of appeals to be exhausted

3  and not procedurally barred.  Respondents answered (docket #120), Sechrest filed a traverse

4  (docket #126), and respondents then filed a notice of supplemental authority (docket #131).  On

5  June 27, 2003, the court entered an order (docket #131) expanding the record, and on July 21, 2003,

6  respondents filed certain exhibits as ordered (docket #135).  On April 19, 2004, this court denied all

7  five claims in Sechrest's third amended petition, and entered judgment accordingly (docket #136,

8  #137).  On June 3, 2004, the court denied Sechrest's motion for reconsideration (docket #140).

9    Sechrest appealed (docket #141), and on December 5, 2008, the court of appeals reversed

10  and remanded.  *Sechrest v. Ignacio,* 549 F.3d 789 (9th Cir.2008), *cert. denied*, 130 S.Ct. 243 (2009).

11  The court of appeals reversed this court's rulings with respect to two of Sechrest's claims, both

12  concerning his death sentences, and ordered that, when this court enters a final judgement, it is to

13  grant habeas corpus relief with regard to the death sentences.  *Id*. at 807-18.  The court of appeals

14  affirmed this court's rulings with respect to the claims asserted in petitioner's third amended habeas

15  petition regarding his convictions.  *Id*. at 805-07.  The court of appeals revived the claims that, on

16  the prior appeal, it had ruled procedurally barred.  *Id*. at 802-05.  Based on intervening authority –

17  *Valerio v. Crawford*, 306 F.3d 742 (9th Cir. 2002) (en banc) – the court of appeals held that the state

18  procedural rule that it had previously held to have barred the claims (NRS 34.810) was not adequate

19  to support the procedural bar.  *Sechrest*, 549 F.3d at 802-05.  The court of appeals remanded,

20  ordering that those revived claims are to be adjudicated on their merits.  *Id*. at 802-05, 817-18.

21  In a footnote, the court of appeals stated that, because its decision mandates relief with respect to

22  Sechrest's death sentences, this court need not adjudicate the remanded claims challenging the

23  death sentences, as those claims are now moot.  *Id*., p. 805 n.5; *see also id*., p. 817 n.16 (court of

24  appeals declined to reach Sechrest's claim that his Fifth Amendment rights were violated by certain

25

26

5

1   testimony in the penalty phase of his trial, because it concluded that Sechrest was entitled to

2   resentencing).[4]

3          Meanwhile, while the appeal in this case was pending, on December 29, 2005, Sechrest filed

4   a new post-conviction petition for a writ of habeas corpus in state court, asserting a claim pursuant

5   to *McConnell v. State*, 120 Nev. 1043, 102 P.3d 606 (2004), in which the Nevada Supreme Court

6   had held it impermissible under the United States and Nevada Constitutions to base an aggravating

7   circumstance in a capital prosecution on a felony upon which a felony murder theory is predicated.

8   Exhibit 3(197).[5]  The state district court dismissed that petition, and Sechrest appealed to the Nevada

9   Supreme Court.  On July 20, 2010, the Nevada Supreme Court dismissed the appeal, determining

10  that it was moot, in view of the ruling of the Ninth Circuit Court of Appeals, ordering that Sechrest

11  is to be granted habeas corpus relief with respect to his death penalties.  Exhibit 2(197).

12         Following the court of appeals' remand, this court held a status conference, and set a

13  schedule for Sechrest to file a fourth amended habeas petition, to reincorporate into his petition

14  the claims that were previously held procedurally barred, for the respondents to answer, and for

15  other proceedings regarding the fourth amended petition.  *See* Minutes of Proceedings dated

16  December 8, 2009 (docket #174); Scheduling Order entered December 9, 2009 (docket #175).

17         Sechrest filed his fourth amended petition (docket #179) on March 29, 2010.  Respondents

18  answered on September 23, 2010 (docket #187).  Sechrest filed a reply on January 12, 2011

19  (docket #197).  Respondents filed a response to the reply on March 23, 2011 (docket #203).

20

21
_____

22        [4]   Additionally, the court of appeals directed this court "to order Sechrest removed from death
    row during the pendency of the proceedings."  *Sechrest*, 549 F.3d at 818.  On November 23, 2009, the
23  court approved a stipulation of the parties, which informed the court that the respondents complied with
    the instruction of the court of appeals regarding Sechrest's housing.  Stipulation and Order entered
24  November 23, 2009 (docket #173).

25        [5]   On January 12, 2011, Sechrest filed his reply to respondents' answer, and, with the reply, filed
    three exhibits relating to this state post-conviction action (docket #197).  Those exhibits are designated
26  Exhibits 1, 2, and 3.  To distinguish them from other exhibits in the record designated Exhibits 1, 2, and
    3, the court refers to the exhibits filed on January 12, 2011, as "Exhibit 1(197)," "Exhibit 2(197)," and
    "Exhibit 3(197)."

1    Respondents' response to Sechrest reply is 28 pages long.  Because that exceeds the page

2    limit set forth in the court's local rules (LR 7-4), respondents filed a motion (docket #202)

3    requesting leave to file the 28-page response to the reply.  Sechrest did not respond to that motion.

4    The court finds that there is good cause for respondents to file their 28-page response to the reply,

5    and the court will, therefore, grant the motion for leave to file that document.

6    When he filed his reply, on January 12, 2011, Sechrest also filed a motion for evidentiary

7    hearing (docket #194).  Respondents filed an opposition to that motion on March 23, 2011

8    (docket #201).  Sechrest filed a reply in support of the motion for evidentiary hearing on

9    April 12, 2011 (docket #204).

10   Standard of Review of the Merits of Sechrest's Claims

11   Sechrest's federal habeas corpus petition was filed prior to enactment of the Antiterrorism

12   and Effective Death Penalty Act of 1996 ("AEDPA"); therefore, pre-AEDPA standards apply to his

13   claims.  *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997).

14   Applying pre-AEDPA standards, the court presumes "that the state court's findings of

15   historical fact are correct and defer[s] to those findings 'in the absence of convincing evidence to the

16   contrary' or a demonstrated lack of 'fair support in the record.'"  *Mayfield v. Woodford*, 270 F.3d

17   915, 922 (9th Cir.2001) (en banc).  The court reviews questions of law, and mixed questions of law

18   and fact, de novo, owing no deference to the state court's legal conclusions.  *Dubria v. Smith*, 224

19   F.3d 995, 1000 (9th Cir.2000) (en banc); *McKenzie v. McCormick*, 27 F.3d 1415, 1418 (9th

20   Cir.1994) (en banc). A petitioner "must convince the district court 'by a preponderance of evidence'

21   of the facts underlying the alleged constitutional error."  *McKenzie*, 27 F.3d at 1418-19 (citing

22   *Johnson v. Zerbst*, 304 U.S. 458, 469 (1938) and *Bellew v. Gunn*, 532 F.2d 1288, 1290 (9th

23   Cir.1976)).

24   The standard, pre-AEDPA, for determining whether an evidentiary hearing is warranted is:

25   an evidentiary is to be granted if (1) petitioner's allegations, if proven, would establish the right to

26   relief, and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the

relevant facts. *Williams v. Calderon*, 52 F.3d 1465, 1484 (9th Cir.1995); *Jeffries v. Blodgett*, 5 F.3d 1180, 1187 (9th Cir.1993).

Analysis of Claims in Sechrest's Fourth Amended Petition

Ground 1

In Ground 1 of the Fourth Amended Petition, Sechrest claims that his constitutional rights were violated by the testimony, in the penalty phase of his trial, of a psychiatric expert, Dr. Lynn Gerow.  Fourth Amended Petition (docket #179), p. 7.

To the extent that Ground 1 includes a claim of ineffective assistance of counsel, for trial counsel allowing the prosecution to call Dr. Gerow as a penalty phase witness, this claim has been resolved, in Sechrest's favor, by the court of appeals.  *See Sechrest*, 549 F.3d at 815-17.  The court will grant Sechrest habeas corpus relief with respect to his death sentences as directed by the court of appeals.

To the extent that Ground 1 includes the separate but related claim that the testimony of Dr. Gerow violated Sechrest's constitutional rights, in view of the court of appeals' ruling that Sechrest is entitled to habeas corpus relief with regard to his death sentences, that claim is moot, and the court does not address it.  *See Sechrest*, 549 F.3d at 805 n.5; *see also id*. at 817 n.16 (court of appeals declined to reach this claim, having already concluded that Sechrest is entitled to resentencing).

Ground 2

In Ground 2, which includes several subparts, Sechrest claims that his constitutional rights were violated "due to the ineffective assistance of defense counsel during his entire representation of Mr. Sechrest."  Fourth Amended Petition, p. 8.  Each of the subparts of Ground 2 is addressed separately, below.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Court propounded a two prong test for analysis of claims of ineffective assistance of counsel:  a petitioner claiming ineffective assistance of counsel must demonstrate (1) that the defense attorney's representation "fell below an objective

8

1    standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the

2    defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors,

3    the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 688, 694.

4         Regarding the first prong – the "effectiveness prong" – the *Strickland* Court expressly

5    declined to articulate specific guidelines for attorney performance beyond generalized duties,

6    including the duty of loyalty, the duty to avoid conflicts of interest, the duty to advocate the

7    defendant's cause, and the duty to communicate with the client over the course of the prosecution.

8    *Id*.  Defense counsel's duties are not to be defined so exhaustively as to give rise to a "checklist for

9    judicial evaluation ... [because] [a]ny such set of rules would interfere with the constitutionally

10   protected independence of counsel and restrict the wide latitude counsel must have in making

11   tactical decisions."  *Id*.  The *Strickland* Court also instructed that review of an attorney's

12   performance must be "highly deferential," and must adopt counsel's perspective at the time of the

13   challenged conduct, in order to avoid the "distorting effects of hindsight."  *Id.* at 689.  A reviewing

14   court must "indulge a strong presumption that counsel's conduct falls within the wide range of

15   reasonable professional assistance ... [and] the [petitioner] must overcome the presumption that ...

16   the challenged action might be considered sound trial strategy."  *Id*. (citation omitted).

17        Construing the Sixth Amendment to guarantee not effective counsel per se, but rather a fair

18   proceeding with a reliable outcome, the *Strickland* Court concluded that demonstrating that counsel

19   fell below an objective standard of reasonableness alone is insufficient to warrant a finding of

20   ineffective assistance.  In order to satisfy *Strickland's* second prong, the petitioner must show that

21   the attorney's sub-par performance prejudiced the defense.  *Id*. at 691-92.  The test is whether there

22   is a reasonable probability that, but for the attorney's challenged conduct, the result of the

23   proceeding in question would have been different.  *Id*. at 691-94.  The Court defined reasonable

24   probability as "a probability sufficient to undermine confidence in the outcome."  *Id*. at 694.

25        If the petitioner makes an insufficient showing as to either one of the two *Strickland*

26   components, the reviewing court need not address the other component.  *Id*. at 697.

1          Ground 2A

2          In Ground 2A, Sechrest focuses on the admission at trial of Daniel Sportsman's testimony

3 that he and Sechrest had engaged in sexual acts involving bondage.  *Id.* at 8-12.

4          Sechrest does not articulate any manner in which his counsel was ineffective with respect to

5 the testimony of Sportsman regarding the their sexual activity.  *See id.*  Sechrest acknowledges that

6 his counsel objected to that testimony.  *Id.*  Sechrest's counsel's objections were asserted in the

7 following exchange, during the direct examination of Sportsman:

8          Q.      How would you describe Ricky Sechrest?

9          MR. AIMAR [Sechrest's counsel]:   Objection, your Honor.  I don't see that
  that's relevant, particularly, to this case.  It has nothing to do with the crimes charged.

10
          MR. HOWARD [prosecutor]:  Well, your Honor, once again, I believe that there
11 is an inference that this individual is a homosexual.  The charges in reference to the
  kidnapping allege that, in fact, he picked up those girls from the Meadowood Ice Skating
12 Arena with the intent to take them to the Lagomarsino Canyon and there to commit
  murder, lewd acts with a child under the age of 14, and/or sexual assault.

13
          Now, obviously, if he is a homosexual, that is going to lead away from the
14 inference that he, in fact, committed sexual assault with these young girls, so I think his
  sexual preference is, in fact, relevant to that issue.

15
          THE COURT:  It seems to me that during the selection of the jury reference was
16 made along these lines, and I also feel that this is something that can and should be
  considered into evidence in this matter.

17
          The objection is overruled.
18
  BY MR. HOWARD:
19
          Q.      Would you describe the defendant, Rick Sechrest?
20
          A.      Bisexual.
21
          Q.      Bisexual?
22
          A.      Yes.
23
          Q.      And by that, you mean he had feelings for both men and women?
24
          A.      Yes.  I don't really know about men – I know – I know I was the only
25 man that he – that I knew that he ever really had any feelings for.

26
          Q.      But you knew, also, that he had feelings for women?

1          A.      Yes.

2          Q.      Now, Danny, did you and the defendant ever engage in any acts of
bondage?

3

4          MR. AIMAR:   Objection, your Honor.  That is not relevant, what their private
life was.  There isn't any evidence in this case, at this point, going towards – showing
other kinds of sexual acts.

5

6          The fact that he is bisexual is, perhaps, relevant at this point, based upon your
recent ruling, but I don't see any basis for that whatsoever, and I think the state should
not be allowed to ask into that area.

7

8          MR. HOWARD:  Your Honor, we have tentatively introduced a leash, which the
state intends to show is, in fact, linked to the commission of the offense occurring on
May 14, 1983.

9

10         The state is going to link up that leash with this defendant, Rick Sechrest.

11         Further, we know that that leash was found by the unclothed body of Maggie
Schindler.  Maggie Schindler, we know, only had her panties, her underwear on.

12         And the state is also intending to show, through the statements that will come out
in reference to Ricky Sechrest's confession, that he did not use that leash for any
13    purpose, had no knowledge of what that leash was there for.

14         I think that under *Geary v. State* that leash is relevant, because it is at the crime
scene, it can be linked to the defendant, and so it is relevant and material on both of
15    those issues.

16         Further, I think that the jury should be able to infer from the testimony why that
leash was there, what was Ricky Sechrest doing with that leash.

17

18         THE COURT:   Do you have anything further?

19         MR. AIMAR:    Yes, your Honor.  The entire argument is talking about
something that this proposed exhibit, a leash – The question I objected to had to do with
what was, perhaps, the personal life between the witness and Ricky Sechrest.  I don't see
20    the connection.

21         I think getting into these things like that are extraneous matters, certainly ones
that are going to make the jury think about things, not that he committed the crimes
22    charged.

23         THE COURT:   I think the possible relevance that the district attorney is talking
about is in circumstances, which may give rise to an inference, which is the way some
24    evidence does come in –

25         MR. AIMAR:  Perhaps some questions are going in line of that proposed exhibit
is one that would be in order.  I don't see as it is asked generally that it has any
26    relevance.

11

1    We don't know whether we are talking about over a period of years or a
particular incident, if at all.  I think the whole thing is irrelevant.

2

       THE COURT:   I can see some relevance to it.

3

       The objection is overruled.

4

5    Exhibit 44, pp. 56-59.  After the objection was overruled, Sportsman testified as follows:

6           Q.    Did you and Rick Sechrest engage in any acts of bondage?

7           A.    He tied me up a couple of times.

8           Q.    He tied you up a couple of times?

9           A.    Yes.

10          Q.    How many times?

11          A.    Twice.

12          Q.    Would you describe how he tied you up?

13          A.    Just my hands and my feet.

14          Q.    What did he tie you up with?

15          A.    Belts, a housecoat robe.

16          Q.    He would tie you up?

17          A.    Yes.

18          Q.    Your arms and your legs?

19          A.    Yes.

20          Q.    And then what would he do?  Would he engage in sex with you?

21          A.    Ejaculation, that was usually it.

22   *Id*. at 59-60.  And, on cross-examination, Sportsman testified as follows:

23          Q.    There was some discussion about being tied up.  Did you agree to do that?

24          A.    Yes.

25          Q.    How many times did you say it had occurred?

26          A.    Twice.

12

1    Q.    Did it happen here in Nevada?

2    A.    Once.

3    Q.    And the other time was –

4    A.    California.

5    Q.    How long ago?

6    A.    A long, long time ago.

7    Q.    Did this time in Nevada happen this year?

8    A.    Yes, I am pretty sure it was this year, yes.

9    Q.    Do you know when?

10   A.    I cannot put a date on it or a month or anything, no.

11   Q.    Did you ask him to do that?

12   A.    I could have.  I could have.

13   Q.    Had you ever done that before?

14   A.    I was into experimenting then.

15   *Id*. at 79.

16        Sechrest's counsel attempted, by means of his objection, to prevent the testimony of

17   Sportsman regarding his sexual activity with Sechrest.  And, after the judge overruled his objection,

18   counsel evidently attempted to limit the damage by establishing that those acts were consensual,

19   and suggested by Sportsman.  Sechrest does not specify what else his counsel should have done with

20   regard to this testimony.  Sechrest does not give any indication what facts he could show at an

21   evidentiary hearing to support this claim of ineffective assistance of counsel.  Sechrest's claim of

22   ineffective assistance of counsel, regarding Sportsman's testimony, is therefore without merit, and

23   an evidentiary hearing is not warranted.

24        The court also finds without merit Sechrest's separate but related claim, in Ground 2A,

25   that the admission of Sportsman's testimony violated his constitutional rights.  A state court's

26   evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state

13

1   proceedings so fundamentally unfair as to violate due process. *Drayden v. White*, 232 F.3d 704, 710

2   (9th Cir.2000); *Spivey v. Rocha*, 194 F.3d 971, 977–78 (9th Cir.1999); *Jammal v. Van de Kamp*, 926

3   F.2d 918, 919 (9th Cir.1991). "[F]ailure to comply with the state's rules of evidence is neither a

4   necessary nor a sufficient basis for granting habeas relief." *Jammal*, 926 F.2d at 919. "A habeas

5   petitioner bears a heavy burden in showing a due process violation based on an evidentiary

6   decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir.2005).

7        There was evidence presented at trial showing that, when found, Maggie's body was

8   disrobed, except for her underwear, and a leash was found nearby. *See* Exhibit 44, pp. 5, 9

9   (testimony of Don Means); *id*, pp. 23-24 (testimony of David Leland Keller). A hair was found on

10  the leash, and there was testimony that the hair was similar to hairs found in Sechrest's car.

11  *See* Exhibit 42, pp. 20-25 (testimony of Robert Thompson). Sechrest admitted, in his statement to

12  the police, that, after he killed Maggie, he removed all her clothing and attempted to have sexual

13  intercourse with her, and, when he was unable to do that, he masturbated, and ejaculated onto her

14  body. *See* Exhibit 147, pp. 38-43 (Sechrest's statement to the police). In view of the evidence,

15  indicating that there was a sexual component to the kidnappings and killings, the testimony

16  indicating that Sechrest had previously engaged in acts of bondage for sexual pleasure was relevant;

17  that testimony certainly was not fundamentally unfair.

18       The court, therefore, finds there to have been no constitutional error with respect to the

19  testimony of Sportsman regarding the acts of sexual bondage that he and Sechrest engaged in, and

20  the court will deny habeas corpus relief with respect to Ground 2A.

21            Ground 2B

22       In Ground 2B, Sechrest states his claim, in its entirety, as follows:

23  Defense counsel was ineffective for failing to investigate the hair found on the leash, object to and challenge the scientific validity of the testimony of state witness Robert

24  Thompson ... that the hair found on the leash was similar to hair found in Mr. Sechrest's car.

25

26

14

1    Fourth Amended Petition, p. 12.  Sechrest asserts, in his reply, that his defense counsel "failed to

2    call an expert witness to testify in Mr. Sechrest's defense by disputing the indeterminate results the

3    state's expert's proffered."  Reply, p. 17.  He goes on in the reply: "By failing to consult with expert

4    witnesses – much less proffer expert testimony that challenged the state's experts – trial counsel

5    rendered objectively unreasonable assistance."  *Id*. at 18.  Sechrest asserts further in the reply:

6    "Given the inconclusive physical evidence presented by the state, trial counsel's failure to question

7    the state's proffer through its own experts clearly unconstitutionally prejudiced Mr. Sechrest."  *Id*.

8           Sechrest's claim in Ground 2B is without substance.  Sechrest does not allege, with any

9    specificity, how the testimony of Robert Thompson, regarding the hair found on the leash, could

10   have been challenged.  Sechrest, does not explain any manner in which Thompson's testimony was

11   faulty.  Sechrest has not proffered to this court any expert opinion contrary to Thompson's.  In short,

12   Sechrest's allegations in Ground 2B are unspecific, speculative, and wholly unsupported.

13          Sechrest makes a motion for an evidentiary hearing on Ground 2B.  *See* Motion for

14   Evidentiary Hearing (docket #194); Reply in Support of Motion for Evidentiary Hearing

15   (docket #204).  In that motion, with regard to what he would show at an evidentiary hearing,

16   Sechrest states only: "These claims merit an evidentiary hearing so that Mr. Sechrest may present

17   expert testimony regarding the irrelevant and unreliable hair evidence found on the leash."  Reply in

18   Support of Motion for Evidentiary Hearing, p. 2.  Sechrest does not provide any detail regarding the

19   evidence he would proffer at an evidentiary hearing.  Sechrest does not show that, at an evidentiary

20   hearing, he could possibly prove facts that would establish that habeas corpus relief is warranted.

21   The court will deny Sechrest's motion for an evidentiary hearing on this claim.

22          The court finds there to be no showing that Sechrest's attorney performed in an objectively

23   unreasonable manner with regard to his handling of the evidence regarding the hair found on the

24   leash, and, therefore, the court finds there to be no constitutional error shown in Ground 2B.  The

25   court will deny habeas corpus relief with respect to Ground 2B.

26

<u>Ground 2C</u>

In Ground 2C, Sechrest claims that his counsel was ineffective with respect to the admission of five photographs of the bodies of Maggie and Carly, which were admitted at trial over defense objection.  Fourth Amended Petition, pp. 12-13.

At trial, Sechrest's counsel objected to admission of the photographs, in the following exchange:

MR. AIMAR [SECHREST'S COUNSEL]:   Your Honor, once again, I object to the admission of these.  I think the testimony of the doctor at this point has been sufficient to explain what his findings were, and that the pictures merely add to something that is unnecessary.

I feel, for the same reasons that I objected to the two photographs earlier, they are meant to inflame the passions of the jury in this case and don't serve any purpose beyond which he has already testified or any other questions that may be asked.

Accordingly, I feel the addition of all these extra pictures just merely – sort of an overkill of the situation.

Accordingly, I don't feel you should let them in at this time.

THE COURT:   Let me see them.

MR. LANE [PROSECUTOR]:  I will wait until the Court observes them before I make my response.

THE COURT:   Go ahead.

MR. LANE:   As a matter of fact, if it please the Court, they are not meant to be inflammatory at all.  As a matter of fact, under the circumstances, they are quite ungruesome.

What they are are simply a way to depict to the naked eye that which the doctor has testified about.

And as I have been in front of your Honor many times before with facts created by myself, we are trying to demonstrate to the jury what happened.  We don't intend to ask the Court to admit anymore photographs of this particular character.

However, the doctor has testified as an expert, and he has testified in a technical manner and, certainly, the jury, I would submit, your Honor, is entitled to see by their naked eye that which it is the doctor has testified about.  That is the purpose for the offer.

MR. AIMAR: Your Honor, if I may respond briefly.  If the Court feels they are admissible, I think, perhaps, the Court should limit it to one of the pictures per each of the girls, rather than the necessity of having two of Carly Villa and three of Maggie Schindler.  Perhaps they should pick one, if you are going to admit it.

16

1          MR. LANE:   May I be heard on that?

2          THE COURT:   Yes.

3          MR. LANE:   If there was one fracture, that might be an argument.  But, in fact, the doctor has testified there is more than one fracture.

4

5          These photographs, I think the Court has realized that when it saw the photographs, does not depict the same thing over and over.  Indeed, it depicts different fractures and different marks.  That is the whole purpose of the offer.

6

7          THE COURT:   I think that the photographs meet the purpose of the offer, and I think that they are and will be helpful in establishing some of the things that have to be established.

8

9          They are not particularly gruesome.  I don't think they are inflammatory.

          The objection is overruled.  They are admitted.

10

11  Exhibit 43, pp. 85-86.

12      Sechrest does not articulate any manner in which his counsel could have done more in his

13  attempt to exclude the photographs.  This claim of ineffective assistance of counsel is wholly

14  without merit.

15      In Ground 2C, Sechrest also asserts the separate but related claim that his constitutional

16  rights were violated by the trial court's admission of the photographs.  *See* Reply, p. 12.  However,

17  that substantive claim – that the admission of the photographs, rather than counsel's performance

18  with respect to them, violated Sechrest's federal constitutional rights – was not a claim remanded by

19  the court of appeals for resolution by this court.

20      The court of appeals' order, with regard to the claims to be considered by this court on

21  remand, was as follows:

22          We conclude that the habeas claims the Nevada Supreme Court dismissed under NRS 34.810 should not have been barred from federal review.  We reverse and remand

23  to the district court for consideration of those claims on the merits.  [Footnote: As we later conclude, for separate reasons, that there were due process violations during the

24  penalty phase of the trial, the claims that go to due process violations in sentencing need not be revisited.  We remand for consideration of the other claims dismissed under NRS

25  34.810.]

26                           *   *   *

1    With respect to the guilt phase, we hold that Sechrest's *Miranda* rights were not
2    violated, and affirm the district court on this ground.  We also hold, however, that
     Sechrest's previously defaulted claims – which include both guilt and penalty phase
3    claims – should not have been barred from federal habeas review.  We remand these
     claims to the district court for appropriate consideration.

4    *Sechrest*, 549 F.3d at 805, 817.  The claims that the court of appeals remanded to this court were in

5    Sechrest's second amended petition for writ of habeas corpus (docket #70); upon the direction of the

6    court of appeals, those claims were omitted when Sechrest filed his third amended petition.  There

7    was not, in Sechrest's second amended petition, any claim that Sechrest's constitutional rights were

8    violated by the admission of the photographs of the victims.  *See* Second Amended Petition (docket

9    #70).  In the second amended petition, Sechrest's claim regarding the photographs was plainly and

10   exclusively a claim of ineffective assistance of counsel.  *See id.*, pp. 31-33.  Sechrest's new claim,

11   that the admission of the photographs, itself, violated his federal constitutional rights, is beyond the

12   scope of the remand, and this court rejects it on that basis.

13        Moreover, even if the court were to address the merits of Sechrest's  claim that the admission

14   of the photographs violated Sechrest's federal constitutional rights, the court would find that claim

15   to be without merit.  A state court's evidentiary ruling, even if erroneous, is grounds for federal

16   habeas corpus relief only if it renders the state proceedings so fundamentally unfair as to violate the

17   defendant's constitutional right to due process of law.  *Drayden*, 232 F.3d at 710; *Spivey*, 194 F.3d

18   at 977–78; *Jammal*, 926 F.2d at 919.  "[F]ailure to comply with the state's rules of evidence is

19   neither a necessary nor a sufficient basis for granting habeas relief."  *Jammal*, 926 F.2d at 919.

20   "A habeas petitioner bears a heavy burden in showing a due process violation based on an

21   evidentiary decision."  *Boyde*, 404 F.3d at 1172.  It is beyond cavil that the photographs were

22   relevant; they showed graphically that mortal wounds to the girls' skulls could have been caused by

23   blows with a shovel.  *See* Exhibits 123, 124, 125, 126, 127; *see also* Exhibit 43, pp. 82-84

24   (testimony of Dr. Anton Paul Sohn).  The admission of those photographs into evidence was not

25   fundamentally unfair, and did not violate Sechrest's right to due process of law.

26        The court will, therefore, deny habeas corpus relief with respect to Ground 2C.

18

1            Ground 2D

2        In Ground 2D, Sechrest claims ineffective assistance of counsel, by his trial counsel, as

3    follows: "Given Mr. Aimar's purported experience, and the reputation in the legal community of the

4    prosecutor, Mr. Lane, for committing misconduct, Mr. Aimar should have moved in limine prior to

5    trial to preclude Mr. Lane from making improper arguments to the jury."  Fourth Amended Petition,

6    p. 13.

7        This claim is specious.  Sechrest does not point to any particular sort of evidence or

8    argument on the part of the prosecutor that his counsel should have sought, prospectively, to

9    exclude; rather, his argument is that his counsel should have sought to exclude improper arguments

10   by the prosecutor in general.  Regardless of what the reputation of the prosecutor may allegedly have

11   been at the time of the trial, this court cannot find that Sechrest's counsel was reasonably expected

12   to make such a motion in limine.

13       As Sechrest does not set forth a viable theory of ineffective assistance of counsel in

14   Ground 2D, the court will deny Sechrest an evidentiary hearing, and will deny habeas relief, with

15   respect to that claim.

16           Ground 2E

17       In Ground 2E, Sechrest claims that his trial counsel was ineffective for failing to object to the

18   alleged aggravating circumstances, as overbroad, vague, and unsupported by the evidence.  Fourth

19   Amended Petition, pp. 14-17.

20       In view of the court of appeals' ruling that Sechrest is entitled to habeas corpus relief with

21   regard to his death sentences, this claim is moot, and the court will, for that reason, deny relief on it.

22   *See Sechrest*, 549 F.3d at 805 n.5; *see also id*. at 817 n.16 (court of appeals declined to reach penalty

23   phase claim, having already concluded that Sechrest is entitled to resentencing); *see also* Reply, p.

24   19 (Sechrest concedes claim is moot).

25

26

1            Ground 2F

2            In Ground 2F, Sechrest claims that his counsel was ineffective for his "[f]ailure to present a

3    defense." Fourth Amended Petition, p. 18.  Sechrest argues that "[b]y admitting guilt, and informing

4    the jury that Mr. Sechrest's mental state at the time of the incident was at issue, but failing to

5    investigate, develop or present testimony to develop this defense, defense counsel was ineffective."

6    *Id*.  Sechrest emphasizes in his reply that his counsel did not contact or call expert witnesses.

7    Reply, p. 20.  Sechrest argues: "The effect was the same as if Mr. Sechrest had no counsel, which is

8    prejudicial per se."  Fourth Amended Petition, p. 18.

9            Sechrest's claim is belied by the record.  Sechrest's counsel did not "admit guilt."  Rather, in

10   both his opening statement and closing argument, counsel acknowledged that Sechrest took Maggie

11   and Carly into the hills and killed them there, but counsel asserted that he did so without the

12   requisite intent for first degree kidnapping or first degree murder.  In his opening statement,

13   Sechrest's counsel stated:

14           The prosecutor has given you his version of the facts of the case.  The defense
             disputes that version, and we feel that the deaths of Carly Villa and Maggie Schindler
15           took place in a manner different than that.

16           Mr. Sechrest has made a statement to the police and explained at the time what
             happened.  That statement will be admitted into evidence, and you will have a chance
17           to hear it.  The prosecutor, Mr. Lane, has indicated that, too.

18           In the statement, on the 14th of June, Ricky Sechrest stated to the police that he
             did , in fact, drive to Meadowood Mall after dropping Danny Sportsman, his roommate,
19           off at work.  He was there looking around when he ran into Maggie Schindler and Carly
             Villa.  It will become clear he knew Maggie Schindler because Zella Weaver, his
20           grandmother, in fact, babysat for Maggie.  he had taken Maggie and his grandmother
             places on occasion.

21
             The evidence will show he did not know Carly Villa prior to that day that she was
22           with Maggie.  They talked, and at that time Ricky and the girls discussed going up to the
             canyon, up rock hunting.

23
             At that point, everybody, the three people, the two girls and Ricky, decided it was
24           a good idea and decided to go.  At that point, by his own statements, he did not intend
             to do more than go for a ride out in the desert to go look for rocks.

25
             The evidence will not prove beyond a reasonable doubt that he enticed them to
26           go for the purpose of sexual assault or the purpose of killing them.

20

1        The evidence will not prove that he kidnapped them in that regard.

2        The evidence will show that Maggie did make a phone call around 1:30 to call
3   her mother.  We can only speculate what that call was about.

4        But after that, she was unable to reach her mother.  They went up for a ride in the
    canyon.

5        The evidence will show that Ricky has been up in the canyon and done rock
6   hunting.  There is evidence to show he lived up in the Lockwood area at some point.

7        Carly went with Maggie because they were friends.  They wanted to go along for
    the ride.  They had never been up in the canyon.

8        After they got up in the canyon rock hunting, the evidence will show – and the
9   statement from what Ricky said is that Carly fell and hit her head.  The evidence will
    show that Ricky thought that she was dead, that Maggie thought she was dead.
10  Apparently, she was unconscious, we don't know.

11       Ricky will say in his statement that he tried to take her pulse.  He is not a nurse,
    he is not an EMT or anything like that, but he did that and thought that she was dead.

12       At that point the evidence will show, from what Ricky is going to testify in his
13  statement, that Maggie started to panic, started to get hysterical.  Maggie started running
    away, and at that point Ricky did strike her on the head, did hit her with a rock and
14  knocked her down.

15       Ricky was panicked, and he was hysterical, he lost control, and he did, without
    deliberation or premeditation, kill her.

16       Thereafter, in that same panic, the evidence is going to show that Ricky went
17  back, got a shovel, thinking to bury them, still in this same panic, same period of time,
    saw that Carly had moved and, apparently, was not dead, and he went ahead and killed
18  her.  He had never recovered from the hysteria and panic.

19       He then buried them and he did leave.  There will be testimony about the sexual
    conduct that has been indicated by Mr. Lane.

20       At the end of this evidence, you will be asked to make a decision on this, and I
21  submit that the state will have proven some of the things that this prosecutor has
    indicated, but they will not have proven the crime of kidnapping.  He did not intend to
22  take them into the canyon to do anything.

23       The state will fail to prove that he committed premeditated and deliberate
    murder.

24       As a result, I feel that you should listen to each evidence as it comes in and not
25  be swayed by the order in which it is presented, and that you should add each piece of
    evidence and help it fill in this total picture.

26

1

2
> We are confident you will decide this case intelligently and give Ricky the presumption of innocence and will convict him of only the crimes that the state can prove.

3

4
> And at the end of that, I submit the state will not be able to prove beyond a reasonable doubt kidnapping in either case or first degree murder.

5
Exhibit 43, pp. 13-16.  Sechrest's counsel returned to these same themes in his closing argument:

6

7

8

9

10
> On behalf of my client, I want to tell you, as I did in the beginning, that Ricky Sechrest did commit the murder, that he did not kidnap Maggie Schindler and Carly Villa. Mr. Sechrest did strike Maggie, did strike Carly, but he didn't premeditate and deliberate it.  If he did not do so, then the murder is murder in the second degree.  And as you read the instructions and consider the testimony at the end of this, I am going to ask that you return verdicts on Counts I and II, which are the murder counts as to second degree murder, and I am going to ask that you return verdicts of not guilty on either of the kidnapping charges.

11
Exhibit 42, p. 102.  In his closing argument, Sechrest's counsel argued further that the prosecution

12
had not proven the kidnapping charge, and that Sechrest was only guilty of second degree murder,

13
because there was no premeditation and deliberation.  *Id.* at 112-16.  Sechrest's claim that his

14
counsel "admitted guilt" is contradicted by the record.

15
Also, Sechrest does not accurately state the facts, as shown by the record, when he argues:

16
"trial counsel did not contact or call expert witnesses."  Reply, p. 20.  As the court of appeals has

17
stated, Sechrest's counsel did in fact contact an expert witness, Dr. Lynn Gerow, and counsel

18
arranged for Dr. Gerow to examine Sechrest:

19

20

21
> Dr. Gerow's involvement in the case began several months before trial when, at defense counsel's request, the trial judge appointed Dr. Gerow to conduct a psychiatric evaluation of Sechrest.  Using Dr. Gerow's evaluation, defense counsel sought to determine whether Sechrest was fit to stand trial, and to investigate the possibility of an insanity defense.

22

23

24
> Dr. Gerow interviewed and evaluated Sechrest. He then submitted a report addressed to defense counsel marked "Confidential."  The report contained information about Sechrest's criminal history and past drug use.  In the report, Dr. Gerow stated that Sechrest had a "polymorphous perversion."  After reviewing the report and speaking with Dr. Gerow, defense counsel decided not to call Dr. Gerow as a witness at the penalty phase and not to pursue an insanity defense.

25
*Sechrest*, 549 F.3d at 798.  Here, too, Sechrest's claim is belied by the record.

26

22

To say that this was a difficult case for Sechrest's counsel to defend is understatement. Sechrest's statement to the police was devastating to his defense, and that statement was in many respects corroborated by other evidence; in no respect was Sechrest's statement to the police significantly undermined by any other evidence. In short, the evidence of Sechrest's guilt was overwhelming. *See* discussion of Ground 4I, below. Even in hindsight, it is hard to imagine what other approach Sechrest's counsel could have taken to defend against the first degree kidnapping and first degree murder charges in the guilt phase of the trial. Sechrest does not make any specific suggestion in this regard. Sechrest does not indicate what other strategic approach his counsel could reasonably have taken. Sechrest does not identify any particular expert witness who would have helped his cause. Sechrest does not proffer any evidence to illustrate any sort of expert opinion that he contends should have been presented at trial by his counsel. Sechrest does not request an evidentiary hearing on this claim. *See* Motion for Evidentiary Hearing; Reply in Support of Evidentiary Hearing.

Sechrest has not shown that his counsel failed to present a defense, or that his performance, with respect to the nature of the defense presented, was objectively unreasonable. The court will deny habeas corpus relief with respect to Ground 2F.

Ground 2G

In Ground 2G, Sechrest claims:

> A seated juror, Mrs. Brooks, failed to acknowledge her bias against homosexuals when she was being voir dired by the judge and counsel, and did not disclose her bias until after defense counsel waived his last peremptory challenge. Based on Mrs. Brooks's subsequent disclosure of bias, the trial court erred not only by failing to remove her for cause, but also by failing to reinstate defense counsel's last peremptory challenge; and defense counsel was ineffective for failing to request that his last peremptory challenge be reinstated in light of Mrs. Brooks's untimely disclosure.

Fourth Amended Petition, p. 18 (citation to record omitted).

This is a new claim, not previously pled in this action, and not remanded to this court for resolution. The claims that the court of appeals remanded were in Sechrest's second amended

1    petition for writ of habeas.  The following is the entire claim, as stated in Sechrest's second amended

2    petition, regarding juror Brooks' purported bias against homosexuals:

3              Defense counsel improperly informed the jury that Sechrest was a homosexual
       during jury selection and thereby violated he [sic] right to a fair trial and effective
4      assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth
       Amendments.

5
              Petitioner was deprived of his rights to due process and effective assistance of
6      counsel due to defense counsel's questioning of a potential juror regarding the possibility
       that evidence that Petitioner was homosexual might be introduced.  Evidence of this type
7      is extremely prejudicial and could cause the members of the jury to view Ricky David
       Sechrest as a deviant, one who might just be sick enough to do what the State alleged.
8      It must have been apparent to defense counsel that if evidence of this nature was
       admitted it would be viewed by the jury as showing that Mr. Sechrest acted in
9      conformity thereof.  At this point in the trial no determination had been made by the
       Court as to whether evidence of Petitioner's sexual preference would be admitted.  The
10     prejudice was substantial and at least one of the members of the jury panel was tainted.
       Just before the members of the jury were to be sworn, Mrs. Brooks stopped the
11     proceedings to inform the Court that she did [not] feel that she could be a fair juror.

12             Although Mrs. Brooks did not feel that Petitioner was "guilty of something"
       because he might be homosexual ... she felt that because of her Christian beliefs she
13     would have a problem with the issue.

14             The introduction of Ricky David Sechrest's possible sexual orientation at a stage
       of the proceeding when it had not yet been determined as admissible could not possibly
15     serve any useful purpose.  On the contrary, it served to inflame and prejudice at least one
       juror.

16

17   Second Amended Petition, pp. 36-37.  There was not, in Sechrest's second amended petition, any

18   claim that the trial court erred by failing to remove juror Brooks for cause, that the trial court erred

19   by failing to reinstate defense counsel's last peremptory challenge, or that trial counsel was

20   ineffective for failing to request that his last peremptory challenge be reinstated.  *See* Second

21   Amended Petition (docket #70), pp. 36-37.  Sechrest's new claim, in Ground 2G of his fourth

22   amended petition, is beyond the scope of the remand, and this court rejects it on that basis.

23        Moreover, even if the court were to address the merits of Ground 2G, the court would

24   conclude that Sechrest has not shown habeas relief to be warranted.  The trial court questioned juror

25   Brooks extensively, and ultimately found that she could act as an unbiased juror.  *See* Exhibit 41,

26   pp. 246-58.  The final exchange between the court and juror Brooks was as follows:

24

1    THE COURT:  And you have been honest and you are not by any means the first
2    person who has had trouble sitting on a jury.  You may have some people sitting right
     there with you before this is over.  You have got the decisions that have to be made in
3    these cases and made by people who aren't used to making these decisions.  They can
     be very difficult, and I think you all know that.  And I think you have accepted that.  And
4    I think that you have, as I say, some emotional feelings about the one subject of
     homosexuality that perhaps no one else has.  But it seems to me that you have told us
5    that you can proceed on this jury and do the job, am I right.

6        MRS. BROOKS:  Yes.

7   *Id*. at 258.  The trial court's determination that juror Brooks could be impartial was a factual finding

8   that this court presumes to be correct.  *See Patton v. Yount*, 467 U.S. 1025, 1036 (1984); *Hart v.*

9   *Stagner*, 935 F.2d 1007, 1013 (9th Cir.1991) ("The determination of whether an individual juror was

10  biased against the defendant is a factual determination that we presume correct in habeas corpus

11  proceedings, under 28 U.S.C. § 2254(d)."); *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1988),

12  *cert. denied*, 493 U.S. 1051 (1990).  Sechrest has not proffered any evidence to undermine the

13  presumption that the trial court's factual finding was correct.

14      In a footnote, in his motion for evidentiary hearing, Sechrest requests an evidentiary hearing

15  on the ineffective assistance of counsel portion of this claim.  *See* Motion for Evidentiary Hearing,

16  p. 3 n. 1.  However, Sechrest does not indicate what factual issue would be the subject of the

17  hearing, how the resolution of that factual issue in his favor would show him entitled to habeas

18  relief, or what evidence he would offer at an evidentiary hearing.  The court will deny Sechrest an

19  evidentiary hearing on Ground 2G.

20      The court will deny habeas corpus relief with respect to Ground 2G.

21          Grounds 2H and 2O

22      In Ground 2H, Sechrest claims that his trial counsel was ineffective with regard to his

23  handling of the voir dire of certain potential jurors who had allegedly been exposed to information

24  about the case and had allegedly formed opinions about it.  Fourth Amended Petition, pp. 23-25.

25  In Ground 2O, Sechrest claims, more generally, that his trial counsel was ineffective for failing

26  "to question the panel of prospective jurors during jury selection regarding the effect of the pre-trial

1    publicity that all had admitted to experiencing." *Id*. at 26.  As the claims in Grounds 2H and 2O are

2    similar and overlapping, the court handles them together.

3         Sechrest claims that his counsel was ineffective with respect to the voir dire of potential juror

4    Azparren, in that, instead of challenging him for cause, counsel asked him questions that served to

5    rehabilitate him as a potential juror, after he stated that he had already formed an opinion about the

6    case, and would vote for the death penalty if Sechrest was convicted of first degree murder.  *Id*. at

7    23.  The transcript reveals that when Mr. Azparren was initially questioned by the court, his opinion

8    was not firm; he said he wanted "to hear both sides."  Exhibit 41, pp. 21-22.  And, during

9    questioning, Mr. Azparren also said that he would be able to approach the evidence with an open

10   mind and decide the case based solely on the evidence and not on any opinions that he may already

11   have had.  *Id*. at 22.  Sechrest's claim focuses on the questioning of Mr. Azparren by counsel later in

12   the day.  *See id*. at 101-04.  At the beginning of that questioning, Mr. Azparren seemed to indicate

13   that he would automatically vote for the death penalty if Sechrest was found guilty of first degree

14   murder, at least if all the other jurors did so.  *Id*. at 101-02.  However, after Sechrest's counsel

15   explored that with Mr. Azparren, and after the judge gave Mr. Azparren further explanation of the

16   procedure by which any penalty in the case would be determined, it appeared that, previously,

17   Mr. Azparren had not understood what he was being asked, and Mr. Azparren then made clear that

18   he would consider the evidence presented in mitigation and would not automatically vote for the

19   death penalty.  *Id*. at 103-04.  The court finds that counsel's questioning of Mr. Azparren was

20   appropriate.  Counsel did not perform unreasonably in this regard.  And, at any rate, Sechrest's

21   counsel used a peremptory challenge to remove Mr. Azparren from the jury.  *Id*. at 149.

22        Next, Sechrest focuses on the voir dire of potential juror Wycoff.  Fourth Amended Petition,

23   pp. 23-24.  With regard to Mr. Wycoff, Sechrest asserts:

24        Mr. Wycoff, when questioned, stated in open court that his wife knew the grandmother
          of the victims and that the grandmother, Ruby Brajkovich, told his wife that, "she just
25        wished she could reach out and touch him." [Exhibit 41, p. 28.]  Clearly the reference
          to "he" was intended to refer to Mr. Sechrest and the sentiment that she wished that she
26        could take the matter into her own hands, connoting vengeance.  This statement was

1    inflammatory and had the effect of serving as a victim impact statement given to the
2    jurors before the start of the case. [*Id*. at 28-31.]

3   Fourth Amended Petition, pp. 23-24.  In his reply, Sechrest states: "It is difficult to imagine how a

4   juror who knew one of the victim's close relatives could not be biased; nevertheless, trial counsel

5   failed to challenge his impartiality."  Reply, p. 22.  Sechrest does not explain, any further, what

6   action he believes his counsel should have taken with respect to Mr. Wycoff.  And, here again, at

7   any rate, Sechrest's counsel used a peremptory challenge to remove Mr. Wycoff from the jury.

8   Exhibit 41, p. 185.

9        Sechrest next focuses on the voir dire of potential juror Raymond.  Fourth Amended Petition,

10   p. 24.  According to Sechrest:

11        Mrs. Raymond candidly stated that she did not think that she could set aside what
         she had learned about the case through the media. [Exhibit 41, pp. 31-33.] Both the trial
12        court and the prosecutor attempted to rehabilitate her. [*Id*. at 31-40.] The discussions
         with Mrs. Raymond sent a message to the other members of the panel that it was
13        frowned upon to be honest and that it was wrong to admit that they could just not set
         aside their opinions.   This exchange occurred in front of the entire panel and
14        undoubtedly had the effect of instructing the panel as to which answers were acceptable
         and which answers they would be punished for.  Even though the prosecutor stipulated
15        to her removal, the manner in which she was questioned and her comments had a chilling
         effect on the panel.  [*Id.*]
16

17   Fourth Amended Petition, p. 24.  Mrs. Raymond was removed from the jury for cause, with the

18   stipulation of the prosecution.  Exhibit 41, p. 40.  Nowhere does Sechrest explain how his counsel

19   allegedly performed ineffectively with respect to the voir dire of Mrs. Raymond.

20        Lastly, Sechrest focuses on the voir dire of potential juror Jouhin.  Fourth Amended Petition,

21   p. 24.  Sechrest asserts:

22        Mrs. Mary Jouhin also admitted that she had been exposed to media coverage and
         that she had formed an opinion as to the innocence or guilt of Mr. Sechrest. [Exhibit 41,
23        pp. 49, 52.] Although she stated that she thought that she could set aside all that she had
         been exposed to prior to the trial, she thought that if she were in Mr. Sechrest's situation
24        that she would not be satisfied to be tried by a juror having her frame of mind.  [*Id*. at
         53.]  When the Court was trying to rehabilitate her, she stated that she thought that she
25        could set her opinion aside if she was shown to be obviously wrong or if she was
         mistaken. [*Id*. at 54-56.] Her answer, despite the Court's best efforts, demonstrated that
26        she was in effect shifting the burden of proof and putting the Petitioner in the position
         of having to prove to Mrs. Jouhin that he was innocent.  [*Id*. at 47-56.]

1
2

> Current counsel acknowledges that defense counsel removed Mrs. Jouhin ... using a peremptory challenge and waived his final peremptory challenge.

3    Fourth Amended Petition, p. 24.  Sechrest does not allege any theory regarding how his counsel's

4    performance was ineffective with respect to the voir dire of potential juror Jouhin.  And, at any rate,

5    Mrs. Jouhin was not seated on the jury; Sechrest's counsel used a peremptory challenge to remove

6    her.  Exhibit 41, p. 131.

7         In summary, with respect to Sechrest's ineffective assistance of counsel claims in Grounds

8    2H and 2O, Sechrest has not articulated any manner in which his counsel performed unreasonably

9    with respect to the voir dire of potential jurors Raymond, Jouhin, Azparren, and Wycoff.  None of

10   those potential jurors was seated on the jury.  *See* Exhibit 41, p. 40 (challenge for cause of potential

11   juror Raymond), p. 131 (peremptory challenge of potential juror Jouhin), p. 149 (peremptory

12   challenge of potential juror Azparren), p. 185  (peremptory challenge of potential juror Wycoff).

13   Sechrest does not make any allegation, in Grounds 2H and 2O, that any individual who was actually

14   seated on the jury was biased.  Therefore, Sechrest cannot show that any conceivable shortcoming of

15   his counsel's performance with respect to juror voir dire caused him prejudice.  *See Ross v.*

16   *Oklahoma*, 487 U.S. 81, 86 (1991) ("Any claim that the jury was not impartial ... must focus ... on

17   the jurors who ultimately sat."); *see also United States v. Martinez-Salazar*, 528 U.S. 304, 317

18   (2000).

19        Sechrest has – in a purely pro forma manner – requested an evidentiary hearing with respect

20   to Grounds 2H and 2O.  He does not state what facts he would seek to prove at an evidentiary

21   hearing, and he does not give any indication of the sort of evidence he would offer.  *See* Motion for

22   Evidentiary Hearing; Reply in Support of Evidentiary Hearing.  Sechrest does not show that if he

23   were allowed to prove any particular fact at an evidentiary hearing, he could establish that habeas

24   corpus relief is warranted on either Ground 2H or Ground 2O.  The court will, therefore, deny

25   Sechrest's request for an evidentiary hearing on Grounds 2H and 2O.

26

In Ground 2H, Sechrest appears to raise other claims besides the claims of ineffective assistance of counsel. *See* Fourth Amended Petition, p. 25 ("Petitioner was deprived of his constitutional rights to a fair trial and right to counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments by virtue of trial court error and defense counsel's ineffective performance."). This is in contrast to the claim that was included in Sechrest's second amended petition, which is the claim remanded to this court for resolution; in the version of the claim in the second amended petition, Sechrest claimed only ineffective assistance of counsel. *See* Second Amended Petition, p. 37 ("Ricky David Sechrest was deprived of his Constitutional rights pursuant to the fifth and sixth amendments due to defense counsel's ineffective performance as to jury selection."). The new claims in Ground 2H are beyond the scope of the remand, and this court rejects those portions of Ground 2H on that basis. Moreover, even if the court were to address the new claims in Ground 2H, the court would deny relief on them. Sechrest does not show that he was denied a fair trial, or trial by an unbiased jury, on account of the manner in which jury voir dire was conducted.

The court will deny habeas corpus relief with respect to Grounds 2H and 2O.

Ground 2I

Sechrest's claim in Ground 2I is, in its entirety, as follows:

> Mr. Sechrest was deprived of his constitutional right to a fair trial due to defense counsel's failure to move for a change of venue. Every juror questioned had been exposed to the case by virtue of the extensive print, television and radio media coverage of the case. Many of the jurors admitted that they had discussed the case prior to trial.

Fourth Amended Petition, p. 25 (citations to record omitted).

In his argument regarding Ground 2I, Sechrest does not show what the standard was in Nevada courts in 1983 for a change of venue. *See id.*; *see also* Reply, pp. 23-24. It is that standard that would have applied to the motion for change of venue that Sechrest asserts his counsel should have made. Sechrest, instead, focuses on the federal constitutional standard, arguing that, as a result

1    of his counsel's failure to move for a change of venue, his federal constitutional rights to due

2    process of law and a fair trial were violated.  *See* Reply, pp. 23-24.

3          Sechrest has submitted, as an exhibit to his reply, copies of newspaper articles about his case,

4    which appeared in Reno newspapers between the time of the disappearance of Maggie and Carly and

5    the conclusion of Sechrest's trial.  Exhibit 1(197).  The court has examined that exhibit, and takes it

6    into consideration in analyzing this claim.

7          Sechrest requests an evidentiary hearing regarding Ground 2I, but that request is completely

8    pro forma; Sechrest does not give any indication what facts he would seek to prove to show that

9    habeas relief is warranted on Ground 2I, and he does not state what evidence he would offer at an

10   evidentiary hearing on that claim.  *See* Motion for Evidentiary Hearing; Reply in Support of Motion

11   for Evidentiary Hearing.   Sechrest does not show an evidentiary hearing on this claim to be

12   warranted.

13         In *Hayes v. Ayers,* 632 F.3d 500 (9th Cir.2011), the court of appeals described the law

14   governing a claimed due process violation resulting from a denial of a request for change of venue:

15               The Sixth and Fourteenth Amendments "guarantee[ ] to the criminally accused
             a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722
16           (1961). When a trial court is "unable to seat an impartial jury because of prejudicial
             pretrial publicity or an inflamed community atmosphere[,] ... due process requires that
17           the trial court grant defendant's motion for a change of venue." *Harris v. Pulley*, 885
             F.2d 1354, 1361 (9th Cir.1988) (citing *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963)).

18

19               In this circuit, we have identified "two different types of prejudice in support of
             a motion to transfer venue: presumed or actual." *United States v. Sherwood*, 98 F.3d 402,
20           410 (9th Cir.1996).  Interference with a defendant's fair-trial right "is presumed when
             the record demonstrates that the community where the trial was held was saturated with
             prejudicial and inflammatory media publicity about the crime." *Harris*, 885 F.2d at 1361.
21           Actual prejudice, on the other hand, exists when voir dire reveals that the jury pool
             harbors "actual partiality or hostility [against the defendant] that [cannot] be laid aside."
22           *Id*. at 1363. The Supreme Court applied this two-pronged analytical approach in a case
             it decided at the end of its last term. *See Skilling v. United States*, 561 U.S. —, 130 S.Ct.
23           2896, 2907 (2010) (considering, first, whether pretrial publicity and community hostility
             established a presumption of juror prejudice, and then whether actual bias infected the
24           jury).

25                                          *     *     *

26

                                              30

1
2
3

"A presumption of prejudice" because of adverse press coverage "attends only the extreme case." *Skilling*, 130 S.Ct. at 2915; *see also Harris*, 885 F.2d at 1361 ("The presumed prejudice principle is rarely applicable and is reserved for an extreme situation." (citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)) (citation and internal quotation marks omitted)).

4

\*   \*   \*

5
6
7
8

Where circumstances are not so extreme as to warrant a presumption of prejudice, we must still consider whether publicity and community outrage resulted in a jury that was actually prejudiced against the defendant. This inquiry focuses on the nature and extent of the voir dire examination and prospective jurors' responses to it. *See Skilling*, 130 S.Ct. at 2917-23.  Our task is to "determine if the jurors demonstrated actual partiality or hostility [toward the defendant] that could not be laid aside." *Harris*, 885 F.2d at 1363.

9   *Hayes*, 632 F.3d at 507-11.

10   Sechrest has not shown that any juror had actual partiality or hostility that could not be laid

11   aside.  *See Harris*, 885 F.2d at 1363-64.  While nearly all the prospective jurors knew of the case,

12   and had been exposed to media coverage of it, there is no indication in the record that the trial court

13   had any unusual difficulty in selecting an impartial jury.  *See* Exhibits 40 and 41.  "[J]urors need

14   not ... be totally ignorant of the facts and issues involved."  *Harris*, 885 F.2d at 1363 (quoting

15   *Murphy v. Florida*, 421 U.S. 794, 800 (1975)).  "The relevant question is not whether the

16   community remembered the case, but whether the jurors ... had such fixed opinions that they could

17   not judge impartially the guilt of the defendant."  *Id*. at 364 (quoting *Patton v. Yount*, 467 U.S. 1025,

18   1035 (1984)).

19   Furthermore, the court has examined the newspaper articles from the time submitted by

20   Sechrest (Exhibit 1(197)), and concludes that, while there were a number of articles in Reno

21   newspapers concerning Sechrest's case, that media attention was not so pervasive and inflammatory

22   as to give rise to a presumption of prejudice.  *See Skilling*, 130 S.Ct. at 2915; *see also Harris*, 885

23   F.2d at 1361.  The newspaper articles were largely factual accounts of the crime and court

24   proceedings, rather than opinion pieces containing inflammatory rhetoric.  *See Harris*, 885 F.2d at

25   1362.

26

31

1    In sum, Sechrest has not demonstrated that there was ineffective assistance of counsel in

2    failing to move for a change of venue, because there is no showing that a motion for change of

3    venue would have had a reasonable chance of success, and there is no showing of a reasonable

4    probability that the outcome of the proceedings would have been different had counsel made a

5    motion for change of venue.

6        The court will deny habeas corpus relief with respect to Ground 2I.

7            Ground 2J

8        Sechrest's claim, in Ground 2J, in its entirety, is as follows:

9            Sechrest was denied his constitutionally protected rights to counsel and a fair trial
         in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments due to defense
10        counsel's failure to conduct an effective investigation prior to trial. The state endorsed
         eighty potential witnesses for trial. It was ineffective for defense counsel to fail to
11        interview these witnesses prior to trial. The court granted defense counsel's request for
         an investigator, a medical expert and the assistance of a forensic pathologist. Defense
12        counsel's expenditures and hours spent preparing for trial, in combination with his
         failure to present a reasonable defense, reflect that he failed to conduct an adequate
13        investigation.

14            Defense counsel's failure to investigate is illustrated by his failure to contact Mr.
         Sechrest's mother, Doris Presser, who lived in Sparks and whose address and telephone
15        number was readily available.

16   Fourth Amended Petition, p. 25 (paragraph numbering omitted). In his reply, Sechrest adds the

17   following:

18            The record before the Court does not demonstrate that trial counsel interviewed
         any witnesses. Witnesses like Mr. Sechrest's grandmother could potentially have
19        supported counsel's theory that Mr. Sechrest's murder of the victims was not
         premeditated. Other family members and friends could have provided evidence as to Mr.
20        Sechrest's mental state – whether he was even capable of forming the deliberate intent
         to kill, given his self-reported feelings of being "crazy" and of experiencing blackouts.
21        *See* Docket No. 135, Ex. 146 at 21. Counsel's failure to speak to Mr. Sechrest's own
         mother is particularly egregious in light of the fact that she was readily available to him
22        and could have provided him with a wealth of information about Mr. Sechrest.
         *See* Docket #104, Ex. A to Ex. 1 at 40 (second state post conviction petition).

23

24   Reply, p. 24.

25        Sechrest's claim fails, for he has not set forth any allegations indicating – and has not

26   proffered any evidence to show – what counsel would have learned from any particular witness

32

1    interview.  Sechrest's allegations that his "grandmother could potentially have supported counsel's

2    theory that Mr. Sechrest's murder of the victims was not premeditated," and his statement that

3    "[o]ther family members and friends could have provided evidence as to Mr. Sechrest's mental

4    state," are insufficient in that they suggest only a possibility that those interviews might have been

5    helpful, and  they do not provide any information about what any witness would actually have said.

6    As for his mother, Sechrest does not give any indication, even in general or hypothetical terms, what

7    his mother would have said to help his case.

8         Sechrest requests an evidentiary hearing regarding Ground 2J, but, here again, he does not

9    give any indication what facts he would seek to prove to show that habeas relief is warranted on

10   Ground 2J, and he does not state what evidence he would offer at an evidentiary hearing on that

11   claim.  *See* Motion for Evidentiary Hearing; Reply in Support of Motion for Evidentiary Hearing.

12   Sechrest does not show an evidentiary hearing on this claim to be warranted.

13        Sechrest does not demonstrate that his counsel performed in an objectively unreasonable

14   manner with respect to his alleged failure to interview witnesses, and Sechrest does not demonstrate

15   prejudice.  The court will, therefore, deny habeas corpus relief with respect to Ground 2J.

16              Ground 2K

17        Ground 2K is a claim that Sechrest's counsel was ineffective for failing to renew a motion

18   for appointment of second counsel.  *See* Fourth Amended Petition, p. 25; Second Amended Petition,

19   p. 41.  In his fourth amended petition, Sechrest states: "This claim was rejected by this Court in its

20   [previous] order," citing this court's order entered April 19, 2004 (docket #136), and the judgment

21   entered the same day (docket #137).

22        The court decided a similar, but not identical, claim in its April 19, 2004 order.  *See* Order

23   entered April 19, 2004 (docket #136).  That was a claim that Sechrest's rights were violated by the

24   trial court's denial of his motion for a second attorney.  *See id*.  The court denied that claim because

25   there was no legal authority supporting a claim that there is a constitutional requirement that a

26

33

1    defendant in a capital case be represented by two attorneys.  *See id*.  The court's ruling on that claim

2    was unaffected by Sechrest's appeal.  *See Sechrest,* 549 F.3d 789.

3        While the claim asserted in Ground 2K is not identical to the claim decided in 2004 – the

4    claim in Ground 2K is a claim of ineffective assistance of counsel – the reasoning of the court in its

5    previous order applies as well to Ground 2K, and leads to the conclusion that renewing the motion

6    for second counsel would not have been successful.  Sechrest's counsel's performance was,

7    therefore, not unreasonable, and Sechrest was not prejudiced.

8        At any rate, in light of the court's ruling in 2004 on the similar claim, Sechrest appears to

9    abandon the claim in Ground 2K.  *See* Fourth Amended Petition, p. 25; *see also* Reply (no argument

10   regarding Ground 2K).

11       The court, therefore, will deny habeas corpus relief with respect to Ground 2K.

12            Ground 2L

13       In Ground 2L, Sechrest claims that his constitutional rights were denied as a result of trial

14   counsel's failure to conduct a preliminary hearing.  *See* Fourth Amended Petition, p. 25.  Sechrest,

15   however, withdraws this claim.  *See id*.  Accordingly, the court will deny relief on it.

16            Ground 2M

17       In Ground 2M, Sechrest claims that his trial counsel was ineffective for failing "to request

18   notice of 'other bad acts' evidence."  Fourth Amended Petition, pp. 25-26.

19       This claim relates only to the penalty phase of Sechrest's trial.  In view of the court of

20   appeals' ruling that Sechrest is entitled to habeas corpus relief with regard to his death sentences,

21   this claim is moot, and the court will, for that reason, deny relief on it.  *See Sechrest*, 549 F.3d at 805

22   n.5; *see also id*. at 817 n.16 (court of appeals declined to reach penalty phase claim, having already

23   concluded that Sechrest is entitled to resentencing); *see also* Fourth Amended Petition, p. 26

24   (Sechrest concedes claim is moot).

25

26

34

1      Ground 2N

2          In Ground 2N, Sechrest claims that his trial counsel was ineffective for failing "to exclude

3   Mr. Sechrest's prior convictions during the penalty hearing."  Fourth Amended Petition, pp. 25-26.

4          This claim, too, relates only to the penalty phase of Sechrest's trial.  In view of the court of

5   appeals' ruling that Sechrest is entitled to habeas corpus relief with regard to his death sentences,

6   this claim is moot, and the court will, for that reason, deny relief on it.  *See Sechrest*, 549 F.3d at 805

7   n.5; *see also id*. at 817 n.16 (court of appeals declined to reach penalty phase claim, having already

8   concluded that Sechrest is entitled to resentencing); *see also* Fourth Amended Petition, p. 26

9   (Sechrest concedes claim is moot).

10      Ground 2P

11          In Ground 2P, Sechrest claims that his trial counsel was ineffective for failing to "life

12   qualify" the jury.  Fourth Amended Petition, p. 26.

13          Here again, this is purely a penalty phase claim.  In view of the court of appeals' ruling that

14   Sechrest is entitled to habeas corpus relief with regard to his death sentences, this claim is moot, and

15   the court will, for that reason, deny relief on it.  *See Sechrest*, 549 F.3d at 805 n.5; *see also id*. at 817

16   n.16 (court of appeals declined to reach penalty phase claim, having already concluded that Sechrest

17   is entitled to resentencing); *see also* Fourth Amended Petition, p. 26 (Sechrest concedes claim is

18   moot).

19      Ground 2Q

20          In Ground 2Q, Sechrest claims that his trial counsel was ineffective for failing to "inform

21   Mr. Sechrest of his right to testify or to allocute."  Fourth Amended Petition, p. 26.  Sechrest,

22   however, withdraws this claim.  *See id*. at 27.  Therefore, the court will deny relief on Ground 2Q.

23      Ground 2R

24          Ground 2R is a cumulative error claim, in which Sechrest claims that "each of the above

25   identified incidents of ineffectiveness, when taken singly and cumulatively, indicate that prior

26   counsel was ineffective throughout the guilt phase of Mr. Sechrest's trial" and that "[t]here is a

35

1  reasonable probability that had defense counsel performed effectively, the results of the trial would

2  have been different."  Fourth Amended Petition, p. 27.

3       Without any discussion, Sechrest requests an evidentiary hearing on Ground 2R.  *See* Reply

4  in Support of Motion for Evidentiary Hearing, p. 3.  Sechrest does not indicate what factual issues

5  would be at issue in such an evidentiary hearing, he does not show he would be entitled to relief on

6  Ground 2R if he was allowed to prove any fact at an evidentiary hearing, and he does not state what

7  evidence he would offer at such an evidentiary hearing.  The court will deny Sechrest's request for

8  an evidentiary hearing on Ground 2R.

9       As the court does not find that the performance of Sechrest's counsel fell below an objective

10  standard of reasonableness, in any manner alleged by Sechrest in Grounds 2A through 2R,

11  Sechrest's claim of cumulative error is unavailing.  The court will deny habeas corpus relief on

12  Ground 2R.

13       <u>Ground 3</u>

14       In Ground 3, Sechrest claims that his constitutional rights were violated because his counsel

15  on his direct appeal was ineffective.  Fourth Amended Petition, p. 28.  Sechrest asserts that his

16  appellate counsel was ineffective for not raising, on his direct appeal, the issues raised by Sechrest in

17  his fourth amended petition.  *Id*.

18       This claim is moot to the extent that it is based upon the alleged failure of Sechrest's

19  appellate counsel to raise issues regarding his death sentences, as the court of appeals has ruled that

20  Sechrest is entitled to habeas corpus relief with regard to those sentences.  *See Sechrest*, 549 F.3d at

21  805 n.5; *see also id*. at 817 n.16 (court of appeals declined to reach penalty phase claim, having

22  already concluded that Sechrest is entitled to resentencing).

23       As for Sechrest's claims that his appellate counsel was ineffective for failing to raise, on his

24  direct appeal, issues regarding his convictions, *i.e*., issues regarding the guilt phase of his trial,

25  Sechrest has not shown any of those claims, as set forth in his fourth amended petition, to be

26  meritorious.  Therefore, Sechrest does not demonstrate that the performance of his appellate counsel,

1    in failing to raise any claim, was objectively unreasonable, or that he was prejudiced by counsel's

2    failure to raise any claim.

3          Sechrest requests an evidentiary hearing on Ground 3.  *See* Reply in Support of Motion for

4    Evidentiary Hearing, p. 4.  However, here again, Sechrest does not indicate what factual issues

5    would be at issue in such an evidentiary hearing, he does not show he would be entitled to relief on

6    Ground 3 if he was allowed to prove any fact at an evidentiary hearing, and he does not state what

7    evidence he would offer at such an evidentiary hearing.  The court will deny Sechrest's request for

8    an evidentiary hearing on Ground 3.

9          The court will deny Sechrest habeas relief with respect to Ground 3.

10   <u>Ground 4</u>

11         In Ground 4, Sechrest claims that his constitutional rights were violated "due to pervasive

12   prosecutorial misconduct throughout the entirety of [his] trial."  Fourth Amended Petition, p. 29.

13   Sechrest alleges eight different kinds of misconduct on the part of the prosecution, and describes

14   those in subparts 4A through 4H of Ground 4; he asserts a "cumulative impact" claim in subpart 4I.

15   *See id*. at 29-36.  In the following sections, regarding Grounds 4A through 4H, the court considers

16   each species of prosecutorial misconduct alleged by Sechrest, and then, in the discussion regarding

17   Ground 4I, the court considers the effect of the conduct on the part of the prosecutor that this court

18   does find objectionable.

19         Respondents include, in their response to the claims in Ground 4, an argument that those

20   claims are procedurally barred because, at trial, Sechrest's counsel did not object to the arguments

21   that Sechrest claims were improper.  *See* Answer, p. 46.  Under the procedural default doctrine, a

22   federal court will not review a claim for habeas corpus relief if a state court's rejection of the claim

23   rested on a state law ground that is independent of the federal question and adequate to support the

24   judgment.  *See Coleman v. Thompson*, 501 U.S. 722, 730-31 (1991).  Respondents do not point to

25   any state-court ruling that the claims of prosecutorial misconduct were procedurally defaulted

26   because of defense counsel's failure to object at trial.  Indeed, on Sechrest's appeal to the Ninth

37

1  Circuit Court of Appeals, that court, based on intervening developments in the law, reversed its

2  previous ruling that these prosecutorial misconduct claims were procedurally defaulted under

3  NRS 34.810, and remanded them to this court for resolution on their merits. *See Sechrest*, 549 F.3d

4  at 803-04, 817 ("Sechrest's previously defaulted claims ... should not have been barred from habeas

5  review.").  The claims of procedural misconduct in Grounds 4A to 4I are not procedurally barred,

6  and are before this court for decision on their merits.

7  <u>Ground 4A</u>

8  In Ground 4A, Sechrest claims that the prosecutor "improperly aligned himself with the

9  jurors, inducing them to trust the state's judgment rather than their own view of the evidence."

10  Fourth Amended Petition, p. 29.  In Ground 4A, Sechrest also complains that the prosecutor

11  vouched for the State's witnesses.  *Id*.  Sechrest points to the following arguments made by the

12  prosecutor:

13  -  In opening statement:  "[I]t is a pleasure today and a privilege, as it has been for the last
13 years, to be in front of you as the attorney representing the people of this county."
14  Exhibit 43 (September 14, 1983 transcript), p. 3, lines 8-11.

15  -  In opening statement:  "We are going to prove that everybody in this county ought to
swell up with pride at what it was that those people [investigating police officers] were
16  able to do with this investigation."  *Id*., p. 7, lines 6-8.

17  -  In opening statement:  "As I said in the beginning, I have been a people's lawyer for 14
years, and I hope to be it yet for a long time, and I hope to be it for a lot longer."  *Id*.,
18  p. 12, lines 11-13.

19  -  In closing argument:  "Ladies and gentlemen, first let me say it has been this last week,
a week plus a day, a pleasure and a privilege as it always is to stand up here before 12
20  people of this county as their attorney and represent them in a criminal case."  Exhibit
42 (September 19, 1983 transcript), p. 80, lines 6-10.

21
-  In closing argument:  "And it is indeed a pleasure and it is a privilege too, on behalf of
22  the people of this county, to ask you to convict him of what he is guilty of, because he
is as guilty as sin based upon this evidence of first degree murder two counts and first
23  degree kidnapping two counts."  *Id*., p. 100, line 30 - p. 101, line 4.

24

25

26

38

1      -      In closing argument: "So anyway, in closing for the people of this county and this state,
it has been as it always is my pleasure, my privilege, God how I love it, my privilege to
2          be in here in front of you and represent the good folks and represent the people of this
county." *Id*., p. 123, lines 18-22.

3

4    Fourth Amended Petition, pp. 29-31.

5           Each of these statements and arguments by the prosecutor was indeed improper. *See United*

6  *States v. Young*, 470 U.S. 1, 18–19 (1985); *United States v. Molina*, 934 F.2d 1440, 1444–45

7  (9th Cir.1991) ("As a general rule, a prosecutor may not express ... belief in the credibility of

8  government witnesses.  Such prosecutorial vouching, which consists of either placing the prestige of

9  the government behind the witnesses through personal assurances of their veracity or suggesting that

10  information not presented to the jury supports the witnesses' testimony, is improper." (citation

11  omitted)); *Leavitt v. Arave*, 383 F.3d 809, 834 (9th Cir.2004); *Sechrest*, 549 F.3d at 810-11.

12           However, as is explained, below, in the discussion of Ground 4I, in light of the strength of

13  the evidence of Sechrest's guilt, the court finds that these improper arguments of the prosecutor did

14  not have any effect on the outcome of the trial.  Sechrest's trial clearly turned, in large part, on the

15  statement that Sechrest, himself, gave to the police.  There was no claim that Sechrest fabricated the

16  inculpatory aspects of that statement, and, generally, there was no evidence to undermine that

17  statement in any significant way.  The prosecutor's improper statements, emphasizing his office and

18  the time he had served in it, aligning himself with the jurors as "their attorney," and vouching for the

19  prosecution's witnesses, had no effect on the key evidence against Sechrest, which was his own

20  statement to the police.  *See* discussion of Ground 4I, below.  The improper arguments of the

21  prosecutor, identified in Ground 4A, did not infect Sechrest's trial with unfairness, *see*

22  *Hall v. Whitley*, 935 F.2d 164, 165-66 (9th Cir.1991), and did not have "substantial and injurious

23  effect or influence in determining the jury's verdict."  *See Brecht v. Abrahamson*, 507 U.S. 619,

24  638 (1993).

25           The court will deny habeas corpus relief with respect to Ground 4A.

26

1              Ground 4B

2              In Ground 4B, Sechrest claims that the prosecutor improperly commented on his invocation

3    of the right to remain silent.  Fourth Amended Petition, p. 30.  Sechrest points to the following, in

4    the prosecutor's closing argument:

5              I might pause here to say there has not been one, single, solitary piece of sworn
              testimony or evidence that contradicts one, single, solitary thing that we put on.

6

7    *Id*.; *see also* Exhibit 42, p. 82, lines 1-3.  Sechrest asserts that the prosecutor's argument served as a

8    comment on the fact that he did not take the stand to testify.

9              The Ninth Circuit Court of Appeals has ruled that "[a] prosecutor is entitled to comment on

10   a defendant's failure to present witnesses so long as it is not phrased as to call attention to the

11   defendant's own failure to testify."  *United States v. Nencoechea*, 988 F.2d 1273, 1282 (9th

12   Cir.1991); *see also United States v. Hill*, 953 F.2d 452, 460 (9th Cir.1991).  The prosecutor's

13   argument, in this case, did not call attention to Sechrest's failure to testify.  In fact, the prosecutor

14   followed the statement quoted above with the following:

15             Now, the defense has the power of subpoena just like I have, and there was not one,
             single, solitary piece of contradictory evidence presented by the defense.

16

17   Exhibit 42, p. 82, lines 4-6.  This plainly was not a reference to Sechrest's failure to testify; the

18   defense would not have to subpoena the defendant.  The prosecutor's comments cannot reasonably

19   be interpreted as commentary on the defendant's failure to testify, especially in light of the

20   prosecutor's mention of the subpoena power of the defense.

21             The court will deny habeas corpus relief with respect to Ground 4B.

22             Ground 4C

23             In Ground 4C, Sechrest claims that the prosecutor improperly disparaged him, and also his

24   counsel.  Fourth Amended Petition, pp. 30-31.  Sechrest complains of the following arguments made

25   by the prosecutor in his closing argument:

26   -       "[Sechrest's statements to the police] were the sorriest excuse for what happened that
             can be imagined."  Exhibit 42, p. 80, line 27 - p. 81, line 2.

40

1  -  "Now, let's look at the defendant's sorry excuse and explanation." *Id.*, p. 80, lines 4-5.

2  -  "Ah, but this defendant, he didn't tell the truth." *Id.*, p. 86, lines 22-23.

3  -  "That is an outright lie.  There is no polite way to characterize it.  That is a lie in this
      statement.  Absolute without equivocation a lie." *Id.*, p. 90, pp. 27-29.

4
   -  "His story is terrible.  It is sorry.  It is a sorry contradiction in what happened." *Id.*,
5     p. 94, lines 28-30.

6  -  "Ladies and gentlemen, if you believe that, then you will have accepted the biggest cock-
      and-bull story ever told in a Washoe County courtroom." *Id.*, p. 95, line 30 - p. 96, line
7     2.

8  -  "It is a sorry statement." *Id.*, p. 98, line 7.

9  -  "[H]e gives a statement, two of them, riddled with inconsistencies, riddled with lies, and
      comes in here and says I didn't do it." *Id.*, p. 100, lines 8-10.

10
   -  "So I submit in all due respect, in all due respect, that defense attorney is trying to make
11    a fool out of you." *Id.*, p. 118, lines 9-11.

12 -  "So all that garbage in that statement about reminding me of my little sister is a bunch
      of hocus-pocus, because if that little girl reminded him of his sister, what happened to
13    her wouldn't have happened.  He said he killed them, but it must be second degree.
      Well, hoop, hoop hurray.  Second degree my behind." *Id*, p. 132, lines 14-19.

14
   -  "[I]f he can run that cock-and-bull story on you based upon the evidence, then all I can
15    say is God help us all." *Id.*, p. 101, lines 9-10.

16        The claim in Ground 4C is not one remanded to this court for decision.  This claim reaches

17 beyond anything Sechrest included in his second amended petition, in the claims remanded to this

18 court.  In the second amended petition, of the statements of the prosecutor now challenged by

19 Sechrest, Sechrest only complained of the last two quoted above, and as to those, the following is

20 how Sechrest presented his claim in the second amended petition:

21        K.  "And if he can come in here, and if he can come in here and if he can run that
          cock and bull story on you based upon the evidence, then all I can say is God help us
22        all..."  (p. 101, 19th).

23        This is a Miranda violation which is clearly to comment on the defendant's
          failure to take the stand.  On top of that he once refers to God as if he has God in his
24        pocket.  That is the statements that were offered in evidence were somehow believed by
          anyone and then by God help us all.  If counsel had such a strong case, one wonders why
25        he repeatedly crosses the line in his various arguments made to this jury.

26                                    *    *    *

                                        41

1    A.  "He said he killed them, but it must be second degree.  Well, hoop, hoop,
hurray.  Second degree my behind."  (p. 122, 19th).

2

3    Exactly what Mr. Lane's behind has to do with the closing arguments escapes
this counsel.  What is obvious that Mr. Lane has got himself in a position with this jury
of cheerleading and letting this jury know that his own personal beliefs that second
degree should be considered.

4

5    Second Amended Petition, pp. 50-51 (as in original).  Those are not the claims that Sechrest asserts

6    now; now he claims that the prosecutor's arguments improperly disparaged him, or his counsel.

7    None of the other prosecution arguments complained of in Ground 4C was mentioned in the second

8    amended petition at all.  In short, the claims made by Sechrest in Ground 4C are not claims

9    remanded to this court for resolution on their merits.  The claims in Ground 4C are beyond the scope

10   of the remand, and this court rejects them on that basis.

11   Moreover, even if the court were to address the merits of Ground 4C, the court has

12   considered the arguments of the prosecutor that Sechrest complains of in Ground 4C, and determines

13   that, taken in context, those arguments were commentary on the defendant's statements to the police,

14   and on his theory of the case; those arguments were not improper *ad hominem* attacks on Sechrest or

15   his counsel.  *See United States v. Birges*, 723 F.2d 666, 672 (9th Cir.1984) ("It is neither unusual nor

16   improper for a prosecutor to voice doubt about the veracity of a defendant who has taken the stand.

17   The prosecutor's interpretation of Birges' duress claim as a "fabrication" is also well within the

18   bounds of acceptable comment.").

19   The court will deny habeas corpus relief with respect to Ground 4C.

20   Ground 4D

21   In Ground 4D, Sechrest claims that the prosecutor committed misconduct by characterizing

22   him as a sexual deviant.  Fourth Amended Petition, pp. 31-33.  Sechrest complains of the following

23   statements and arguments made by the prosecutor:

24   -    In opening statement: "Danny Sportsman is a homosexual, and was the boyfriend/lover
of the defendant.  Now, you are going to hear the defendant is a bisexual not only
homosexual, but a bisexual.  You are going to hear that from Danny Sportsman."
Exhibit 43, p. 5, lines 7-11.

25

26

42

- In closing argument: "[W]e know that he has tied up Mr. Sportsman before. Tied him up, hand and foot, and then masturbated himself and ejaculated on the body. And what did he do to Maggie after he killed her? He ejaculated on the body. I think this leash might have something to do with what it was that he was doing out there." Exhibit 42, p. 89, lines 4-8.

- In closing argument: "He tied him up. He ejaculated on him. All he is doing, ladies and gentlemen, is changing sex. We know he is a bisexual, men and women." *Id.*, p. 94, lines 21-23.

- In closing argument: "I submit that the prior bondage, tying up of Danny Sportsman and ejaculating on his body which is exactly what he did in this case, I suggest to you is evidence and it cannot be looked at in the abstract." *Id.*, p. 118, lines 5-8.

- In closing argument: "We know he didn't have Danny Sportsman with him because you know, like Mr. Sportsman said, and you saw Mr. Sportsman, if there ever was a fish out of water it was Danny Sportsman. He is a lady, a woman in a man's body. And I guess it is not his fault. But he said in his little effeminate way, 'It was wrong. I wouldn't have gone along with that.'" *Id.*, p. 88, lines 5-10.

Fourth Amended Petition, pp. 31-32.

The claim in Ground 4D was not among the claims remanded to this court by the court of appeals. In his second amended petition, Sechrest did not complain of any of these arguments of the prosecutor. *See* Second Amended Petition, pp. 44-50; *see also* Fourth Amended Petition, p. 33, lines 1-2 ("[T]hese specific instances of misconduct were not specifically alleged in Mr. Sechrest's second amended petition.").

Sechrest argues that while these particular alleged instances of misconduct of the prosecutor were not specifically alleged in the second amended petition, "they are more instances of the same type of misconduct already alleged and this Court must consider them in the context of the cumulative nature of the state's pervasive misconduct during trial...." Fourth Amended Petition, p. 33, lines 2-4. However, there was no claim in the second amended petition that the prosecutor committed misconduct by characterizing Sechrest as a sexual deviant. *See* Second Amended Petition, pp. 44-50. This is a new claim, one not remanded to this court for resolution. The remand of claims of prosecutorial misconduct, in general, did not open the door for Sechrest to raise new claims, asserting kinds of prosecutorial misconduct not before alleged. The claim in Ground 4D is beyond the scope of the remand and the court rejects it on that basis.

1    Even if the court were to address this claim, however, the prosecutor's remarks regarding

2    Sechrest's sexuality were not improper.  The prosecution had reason to inform the jury that the

3    evidence showed that Sportsman and Sechrest were lovers; Sportsman was a key witness, and it was

4    important that the jury know their relationship.

5    Furthermore, the prosecution had reason to inform the jury that the evidence showed that

6    Sechrest was bisexual.  The murders obviously had a sexual component.  When found, Maggie's

7    body was disrobed except for her underwear.  *See* Exhibit 44, pp. 23-24 (testimony of David Leland

8    Keller).  Sechrest admitted, in his statement to the police, that, after he killed Maggie, he removed

9    her clothing and attempted to have sexual intercourse with her, and, when he was unable to do that,

10   he masturbated, and ejaculated onto her body.  *See* Exhibit 147, pp. 38-43.  Given the sexual aspects

11   of the killings, the prosecution had reason to inform the jury that the evidence indicated that

12   Sechrest was bisexual, to show that he might have been sexually aroused by the female victims;

13   if the jury were left to believe that Sechrest was purely homosexual, they might have been inclined

14   to doubt that Sechrest could have been sexually aroused by either or both of the two girls.

15   Moreover, the court finds that the evidence regarding the acts of sexual bondage, engaged in

16   by Sechrest and Sportsman, was relevant, and was a fair subject of comment and argument by the

17   prosecutor.  *See* discussion of Ground 2A, *supra*.  There was evidence showing that a leash was

18   found near Maggie's body.  *See* Exhibit 44, pp. 5, 9 (testimony of Don Means).  A hair was found on

19   the leash, and that hair was similar to hairs found in Sechrest's car.  *See* Exhibit 42, pp. 20-25

20   (testimony of Robert Thompson).  Sechrest admitted, in his statement to the police, that he took off

21   Maggie's clothing, and, after he killed her, attempted to have sexual intercourse with her, and that,

22   when he was unable to do that, he masturbated, and ejaculated onto her body.  *See* Exhibit 147,

23   pp. 38-43 (Sechrest's statement to the police).   In view of this evidence, testimony indicating that

24   Sechrest had previously engaged in acts of bondage for sexual pleasure was relevant, and the

25   prosecution's comments and arguments regarding that testimony were not improper.

26

44

1    On the other hand, the court does find that the prosecution's comments about Sportsman –

2    that he was "a fish out of water," and "a woman in a man's body," and that he spoke in a "little

3    effeminate way" – were improper.  The court finds, though, that Sechrest was not prejudiced by

4    those comments.  Sportsman was subpoenaed and called as a witness by the prosecution.  His

5    testimony supported the prosecution's case, and tended to inculpate Sechrest.  The prosecution's

6    improper comments about Sportsman had no effect on the outcome of Sechrest's trial.  In view of

7    the strength of the evidence of Sechrest's guilt (*see* discussion of Ground 4I, below), the court finds

8    that those improper comments did not infect Sechrest's trial with unfairness, *see Hall*, 935 F.2d at

9    165, and did not have "substantial and injurious effect or influence in determining the jury's

10   verdict."  *See Brecht*, 507 U.S. at 638.

11   The court will deny habeas corpus relief with respect to Ground 4D.

12                    Ground 4E

13   In Ground 4E, Sechrest claims that the prosecutor "improperly commented on the victim

14   impact of this crime, and invented evidence to support his opinion."  Fourth Amended Petition,

15   p. 33.  Specifically, Sechrest complains of the following arguments of the prosecutor:

16   -     In opening statement: "Then we are going to prove that he started to mess around with
         those girls.  Then we are going to prove that reasonable inference – we are going to
17       prove that they said no, so he killed one of them or struck one of them down so that
         person couldn't do anything, and maybe had one of them on the leash, we don't know.
18       The leash was right there.  And then ran the other one down and killed her.  That is what
         we are going to prove."  Exhibit 43, p. 11, lines 21-29.
19
20   -     In closing argument: "As a matter of fact, he even talked about going back to Carly,
         going back to that little nine-year-old girl in site number one, gravesite number one, and
21       she moved.  She was crawling around and she might have been alive.  But he bashed her
         head in to cover up what he had done to Maggie."  Exhibit 42, p. 83, lines 1-7.

22   -     In closing argument:  "It might have been when he got up in that canyon away from that
23       road he started to get nasty with those little girls."  *Id*., p. 90, lines 5-7.

24   -     In closing argument:  "Can you imagine, just imagine these two people, these two little
         girls, one nine, this is Maggie Schindler, 10-year-old little girl, and this little girl here,
25       Carly Villa, can you just imagine those little girls being down on the ground and having
         somebody, some well, I don't know, I guess you could use the word human being, I find
26       that difficult, to take this instrument and just go (indicating), which is what it must have
         been to get through those girls skulls with this shovel."  *Id*., p. 92, line 29 - p. 93, line 7.

1  -   In closing argument:  "Think of the hysteria and terror that must have been going
       through that little girl's mind running down that ravine to try to get the hell out of there,
2      to try to get away from this person, this thing over here that was doing what it was that
       he did to her little friend."  *Id.*, p. 96, lines 5-10.
3

4       The claim in Ground 4E is not a claim remanded to this court by the court of appeals.  In his

5  second amended petition, Sechrest did not complain of any of these arguments of the prosecutor.

6  *See* Second Amended Petition, pp. 44-50; *see also* Fourth Amended Petition, p. 34, lines 3-4

7  ("[T]hese specific instances of misconduct were not alleged in the second amended petition.").

8       Sechrest argues that while these particular alleged instances of prosecutorial misconduct

9  were not specifically alleged in the second amended petition, "they are more instances of the same

10 type of misconduct already alleged and this Court must consider them in the context of the

11 cumulative nature of the state's pervasive misconduct during trial."  Fourth Amended Petition,

12 p. 34, lines 4-6.  However, there was no claim in the second amended petition that the prosecutor

13 "improperly commented on the victim impact of this crime, and invented evidence to support his

14 opinion."  *Id.*, p. 33, lines 7-8; s*ee also* Second Amended Petition, pp. 44-50.  This is a new claim,

15 one not remanded to this court for resolution.  The remand of claims of prosecutorial misconduct

16 was not an invitation to Sechrest to raise new claims, asserting kinds of prosecutorial misconduct not

17 before alleged.  The claim in Ground 4E is beyond the scope of the remand, and the court rejects it

18 on that basis.

19      Even if the court were to address the merits of Ground 4E, however, the court would deny

20 Sechrest's claim.

21      For the most part, the statements and argument of the prosecutor, complained of in Ground

22 4E, were not misconduct.  It is well established that the prosecution is allowed to argue what

23 inferences might reasonably be drawn from the evidence.  *See United States v. Weatherspoon*, 410

24 F.3d 1142, 1147 (9th Cir.2005) ("[W]e have recognized that prosecutors must have reasonable

25 latitude to fashion closing arguments, and thus can argue reasonable inferences based on the

26

1   evidence...." (citation and internal quotations omitted)); *United States v. Bracy*, 67 F.3d 1421, 1431

2   (9th Cir.1995); *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir.1993).

3        The prosecutor's arguments were, however, improper to the extent that he asked the jurors to

4   imagine the terror experienced by Maggie and Carly.  That argument appears to have been

5   calculated to inflame the passions of the jury, and it had no proper place in the prosecutor's closing

6   argument.  However, in view of the strength of the evidence of Sechrest's guilt (*see* discussion,

7   below, regarding Ground 4I), the court finds that these improper arguments of the prosecutor did not

8   infect Sechrest's trial with unfairness, *see Hall*, 935 F.2d at 165, and did not have "substantial and

9   injurious effect or influence in determining the jury's verdict."  *See Brecht*, 507 U.S. at 638.

10       The court will deny habeas corpus relief with respect to Ground 4E.

11            Ground 4F

12       In Ground 4F, Sechrest claims that the prosecutor committed misconduct by misstating the

13   law in his closing argument.  Fourth Amended Petition, p. 34.

14       In particular, Sechrest first claims that the prosecutor improperly "described reasonable

15   doubt as having a feeling 'in your heart that you know he did what he is accused of.'"  Fourth

16   Amended Petition, p. 34, citing Exhibit 42, p. 81.

17       The claim in Ground 4F is not a claim remanded to this court by the court of appeals.  In his

18   second amended petition, Sechrest did not complain of this argument by the prosecutor.  *See* Second

19   Amended Petition, pp. 44-50.  There was no claim in the second amended petition that the

20   prosecutor misstated the reasonable doubt standard.  *See id*.  This claim, then, is beyond the scope of

21   the remand, and the court rejects it on that basis.

22       Even if the court were to consider this claim, however, the court finds that the prosecutor's

23   argument, taken in context, did not misstate the reasonable doubt standard.  In context, the

24   prosecutor's argument was as follows:

25            Now, as His Honor has told you, all the instructions are important, but there are
             some we will talk about.  Reasonable doubt.  I won't read it all, but the last part of it
26           says, "After the entire comparison and consideration of all the evidence, your minds are
             in such a condition that you can say that you feel an abiding conviction of the truth of

47

1   the charge," that is in your heart you know he did what he is accused of, "There is not
2   a reasonable doubt."  Reasonable doubt is not a speculative doubt.  It is not a possible
    doubt, but it has to be a substantial doubt.  And, ladies and gentlemen of the jury, there
3   is no substantial doubt in this case at all.

4   Exhibit 42, p. 81, lines 5-15.  While the prosecutor added to the definition of "reasonable doubt" in a

5   way that this court does not condone, the prosecutor did, in the course of his argument, refer the

6   jurors to the court's jury instruction.  This argument by the prosecutor was not so misleading as to

7   infect Sechrest's trial with unfairness.  *See Hall*, 935 F.2d at 165.

8          Next, in Ground 4F, Sechrest claims that the prosecutor "omitted an element of proof from

9   the jury's consideration by instructing the jury that the 'state of mind of the defendant is not before

10  you.'"  Fourth Amended Petition, p. 34, citing Exhibit 34, p. 82.  The court finds this claim to be

11  without merit.

12         Again, Sechrest takes the prosecutor's argument out of context.  The following is the

13  argument of the prosecutor, in context:

14         Now, you know early on we talked a little on voir dire to the jury about insanity.
    As you note from the instructions His Honor has not charged you or instructed you on
15  insanity.  That is because insanity is not this case.  The state of mind of the defendant is
    not before you.  There is something wrong with him.  There is something dangerously
16  wrong with him, but he is sane under our system, under our tests in this state.  So what
    he was thinking about when he was doing what he was doing to those girls isn't before
17  you.  That is important to remember.

18  Exhibit 42, p. 82, lines 6-15.  While the language used by the prosecutor was arguably too broad,

19  in context it is clear that his point was that there was no insanity defense.  This statement by the

20  prosecutor was not unconstitutional prosecutorial misconduct.

21         In his reply, regarding Ground 4F, Sechrest adds a further claim:  that the prosecutor

22  committed misconduct by arguing that the jury could find Sechrest guilty under a felony murder

23  theory.  This claim was not asserted in Sechrest's second amended petition, and is, therefore, beyond

24  the scope of the remand.  *See* Second Amended Petition, pp. 44-50.  Furthermore, this claim is not

25  even asserted in Sechrest's fourth amended petition, the petition now before the court.  *Compare*

26  Fourth Amended Petition, p. 34 ("Mr. Lane improperly stated the law to the jury in two specific

48

1   instances.") *and* Reply, p. 38 ("Mr. Lane improperly stated the law to the jury in three specific

2   instances."). Sechrest has improperly raised this additional ground for relief, for the first time, in his

3   reply. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir.1994) ("A Traverse is not the

4   proper pleading to raise additional grounds for relief."); Rule 2(c)(1) of Rules Governing Section

5   2254 Cases (the habeas petition must "specify all the grounds for relief available to the petitioner").

6   The court will not address this claim on its merits.

7       The court will deny habeas corpus relief on Ground 4F.

8           Ground 4G

9       In Ground 4G, Sechrest claims that the prosecutor "improperly told the jury that they must

10   send a message to the community and improperly pressured the jury to convict." Fourth Amended

11   Petition, p. 34. Sechrest complains of the following arguments of the prosecutor, in his closing

12   arguments:

13   -   "Now, I am going to stand in front of you and tell you what it is that we proved and why
         it is that being honest to yourself and honest to your oath and honest to the people of this

14       county that you ought to convict this defendant of first degree murder, two counts, and
         that is first degree, not second degree, first degree murder, two counts, and two counts

15       of kidnapping." Exhibit 42, p. 80, lines 18-25.

16   -   "[I]n this one instance in your lifetime, you are the conscience in this community. It is
         you and only you who will set the standard in this community for this type of act. And

17       that is a heavy burden. But that is a burden that you must bear consistent with truth,
         consistent with the facts and your oath. I suggest, ladies and gentlemen that, based upon

18       this evidence, your verdict should let the word go out from this courtroom that if any
         person in Washoe County takes, entices, lures, persuades or induces any minor children

19       in this community, kids who go to schools that you work in kids who are your grandkids,
         kids who will be your grandkids' grandkids, if you take those people and you take them

20       in your automobile and you take them away, we are not going to let you kill them ...."
         *Id.*, p. 98, line 20 - p. 99, line 3.

21
     -   "I ask you to be true to your oath.... And do your duty. And your duty is clear." *Id.* at

22       123, p. 123, lines 25-30.

23   -   "And let the word go out from this courtroom that you will not be able to take young
         children from shopping centers in this county. You will not be able to take them from

24       this county and commit acts upon them and kill them and come back in the court, and
         through a statement say it was all an accident. Don't let that happen." *Id.*, p. 124, lines

25       4-9.

26   Fourth Amended Petition, pp. 34-35.

49

There was no misconduct in the prosecutor asking the jurors to be honest to themselves, honest to their oath, and honest to their community.  There also was no misconduct in the prosecutor asking the jurors to do their duty.  Sechrest has not cited any authority holding any of these statements of the prosecutor to be improper.

However, the prosecutor's appeal to the jury to act as the "conscience of the community was improper.  *See United States v. Lester*, 749 F.2d 1288, 1301 (9th Cir.1984).  The prosecutor's appeal to the jury to send a message was also improper.  *See People of Territory of Guam v. Quichocho*, 973 F.2d 723, 727 (9th Cir.1992).  Nevertheless, in view of the overwhelming evidence of Sechrest's guilt (*see* discussion, below, regarding Ground 4I), and the relatively limited nature of these improper arguments, the court finds that these improper arguments did not infect Sechrest's trial with unfairness, *see Hall*, 935 F.2d at 165, and did not have "substantial and injurious effect or influence in determining the jury's verdict."  *See Brecht*, 507 U.S. at 638.

The court will deny habeas corpus relief with respect to Ground 4G.

<u>Ground 4H</u>

In Ground 4H, Sechrest claims that the prosecutor "improperly invoked God and the Bible." Fourth Amended Petition, p. 35.  Sechrest complains of the following, in the prosecutor's closing argument:

- "It is kind of an interesting, interesting piece of legislation, interesting law we have. Thank the good Lord we have it when children are involved."  Exhibit 42, p. 84, lines17-20.

- "And then finally when the police – by God, as I said in the opening statement, they worked around the clock that task force ...."  *Id*., p. 100, lines 4-5.

- "As I said before, you know, in the good book somewhere in that Bible it says – I wish I had read it more – somewhere it says out of the mouths of babes.  Out of the mouths of babes."  *Id*., p. 119, lines 10-12.

Fourth Amended Petition, pp. 35-36.

Sechrest cites *Sandoval v. Calderon,* 241 F.3d 765 (9th Cir.2000), in support of this claim. In *Sandoval*, the court of appeals affirmed the district court's grant of habeas corpus relief with

respect to the petitioner's death sentence, on account of the prosecutor's improper invocation of

religion.  There is, however, no comparison between the forceful arguments made by the prosecutor

in *Sandoval*, summoning religious authority as justification for imposition of the death penalty, and

the passing, rather incidental, references to religion by the prosecutor in this case.  In *Sandoval*, the

court of appeals described the prosecutor's religious arguments as follows:

> During the prosecutor's summation to the jury, he argued that Sandoval should be put
> to death for the murders.  In urging the jury to return death verdicts, the prosecutor relied
> heavily on religious authority as commanding capital punishment for Sandoval's crimes.

> *   *   *

> The prosecutor told the jurors that God sanctioned the death penalty for people like
> Sandoval who were evil and have defied the authority of the State.  He explained that by
> sentencing Sandoval to death, the jury would be "doing what God says."  The prosecutor
> added that imposing the death penalty and destroying Sandoval's mortal body might be
> the only way to save Sandoval's eternal soul.

*Sandoval*, 241 F.3d at 770, 776.  The court of appeals stated that the prosecutor's religious

arguments undercut the principle that "the jury's decision is to be based upon the evidence presented

at trial and the legal instructions given by the court," and violated "the Eighth Amendment principle

that the death penalty may be constitutionally imposed only when the jury makes findings under a

sentencing scheme that carefully focuses the jury on the specific factors it is to consider in reaching

a verdict."  *Id*. at 776.   The court stated that "[a]rgument involving religious authority also

undercuts the jury's own sense of responsibility for imposing the death penalty."  *Id*. at 777.  The

court found there to be constitutional error, and went on: "To warrant habeas relief, Sandoval must

show that the prosecutor's improper argument 'had [a] substantial and injurious effect or influence

in determining the jury's verdict.'"  *Id*. (quoting *Brecht*, 507 U.S. at 638, and *Kotteakos v. United

States*, 328 U.S. 750, 776 (1946)).  Noting that the prosecutor's argument, invoking religion, was

"eloquent, powerful, and unmistakably Biblical in style," and that it "cloaked the State with God's

authority," the court of appeals stated that "[t]here could be no clearer an invocation of divine

authority to direct a jury's verdict."  *Id*. at 778-79.  The court stated that, with respect to the issue of

the death penalty, "[t]his [was] not a case where the evidence overwhelmingly supported the jury's

1  verdict." *Id*. at 779.  The court held that it had "grave doubts about the harmlessness of the error,"

2  and therefore affirmed the grant of habeas corpus relief with respect to the death penalty.  *Id*. at 780.

3         The references to religion by the prosecutor in this case are not at all comparable to the

4  arguments of the prosecutor in *Sandoval*.  All three of the comments of the prosecutor put at issue by

5  Sechrest – "thank the Good Lord;" "by God;" "out of the mouths of babes" – are figures of speech.

6  While those figures of speech derive from religious sources, and while they include mention of God

7  and the Bible, they actually carried little religious meaning.  The prosecutor did not convey any

8  religious doctrine to the jury, and he did not summon religious authority as support for his position.

9  There was no unconstitutional prosecutorial misconduct in these inconsequential references to

10 religion by the prosecutor in this case.

11        The court will deny habeas corpus relief with respect to Ground 4H.

12               Ground 4I

13        In Ground 4I, Sechrest asserts:

14        A cumulative consideration of all of the prosecutorial misconduct that occurred
          in Mr. Sechrest's case, including the "inflammatory, unsupported, and inaccurate"
15        statements that Mr. Lane made during penalty phase argument, *see Sechrest*, 549 F.3d
          at 811, demonstrates that the state engaged in a persistent pattern of misconduct that was
16        prejudicial to Mr. Sechrest, and so infected the integrity of the proceedings as to warrant
          habeas relief even without consideration of prejudice.  There is also a reasonable
17        probability, sufficient to undermine confidence in the outcome, that had this flagrant
          misconduct not occurred, the result of these proceedings would have been different, and
18        the misconduct had a substantial and injurious effect upon the verdict.

19 Fourth Amended Petition, p. 36.

20        Sechrest's claims of prosecutorial misconduct do not, in this court's view, come anywhere

21 near describing "deliberate and especially egregious error of the trial type, or one that is combined

22 with a pattern of prosecutorial misconduct" that could have so undermined the integrity of the trial

23 as to warrant habeas relief whether or not it substantially influenced the jury's verdict.  *See Brecht*,

24 507 U.S. at 638 n. 9.

25        Sechrest's prosecutorial misconduct claims warrant a grant of habeas relief if, in light

26 of the record as a whole, the alleged error "had substantial and injurious effect or influence in

52

1 determining the jury's verdict." *Id*. at 638; *Karis v. Calderon,* 283 F.3d 1117, 1129 (9th Cir. 2002)

2 (prosecutorial misconduct subject to *Brecht* harmless error analysis).

3       The trial court gave the following jury instruction:

4            Nothing that counsel say during the trial is evidence in the case.

5            The evidence in a case consists of the testimony of the witnesses and all physical
             or documentary evidence which has been admitted.

6

7            You are to consider only the evidence in the case, but in your consideration of
             the evidence you are not limited to the sworn testimony and exhibits.  You are permitted
             to draw from facts which you find to have been proved such reasonable inferences as

8            seem justified in the light of your own experience.

9 Exhibit 46, Instruction 22.  In assessing the effect of the prosecutor's improper arguments, the court

10 presumes that the jury followed this instruction.  *See Darden v. Wainwright*, 477 U.S. 168, 182

11 (1986) (holding under the Due Process Clause that defendant was not prejudiced by prosecutor's

12 improper statements in closing argument, in part because "[t]he trial court instructed the jurors

13 several times that their decision was to be made on the basis of the evidence alone, and that the

14 arguments of counsel were not evidence"); *Cheney v. Washington,* 614 F.3d 987, 998 (9th Cir.

15 2010).

16       The most powerful evidence against Sechrest was his statement to the police, in which he

17 admitted to murdering Carly and Maggie.  *See* Exhibits 146, 147 (transcript).  In that statement,

18 Sechrest admitted that on May 14, 1983, he picked up Maggie and Carly at Meadowood.

19 *See* Exhibit 146, pp. 1-7.  He said he asked Maggie if she wanted to go for a ride, and she agreed.

20 *Id*.  He then drove to Lagomarsino Canyon, with Carly and Maggie.  *Id*.  According to Sechrest, the

21 three of them were walking in the hills, rock hunting, when Carly fell backward and hit her head.  *Id*.

22 at 7-8; Exhibit 147, pp. 19-21.  Sechrest said he thought Carly was dead.  Exhibit 146, pp. 7-10;

23 Exhibit 147, pp. 21-22.  Sechrest said Maggie began to "freak out on him," and was "between

24 hysterical and crying."  Exhibit 147, pp. 23-24.  Sechrest stated that he knew it was wrong to be up

25 in the hills with the girls.  *Id*. at 24.  Sechrest said that Maggie began to run, and he panicked, caught

26 her, and hit her on the back of the head with a rock.  Exhibit 146, pp. 10-13; Exhibit 147, pp. 24-25.

1   According to Sechrest, after hitting Maggie with the rock three or four more times after she fell, he

2   went to his car and got a shovel to bury the girls.  Exhibit 146, pp. 14-15; Exhibit 147, p. 29.

3   Sechrest said he returned to where Carly was lying, and thought she was still alive because she had

4   moved, so he killed her by striking her in the head with the edge of the shovel.  Exhibit 147, pp.

5   30-31.  Sechrest said that he then went to where Maggie was laying, and found that she, too, had

6   moved; he said that he then might have hit her with the shovel.  Exhibit 147, p. 35.  Sechrest said

7   that, after he killed Maggie, he took off her clothing and attempted to have sexual intercourse with

8   her; according to Sechrest, when he was unable to do that, he masturbated, and ejaculated onto her

9   stomach.  *Id*. at 38-43.  Sechrest said that he covered the bodies with loose dirt, and left the scene.

10  *Id*. at 43-50.

11       A recording of Sechrest's statement was played for the jury, and a transcript of it was

12  provided to the jury.  *See* Testimony of Robert Bogison, Exhibit 42, pp. 45-55; *see also* Exhibits

13  146, 147.  The court of appeals held that Sechrest's statement was not taken in violation of the rules

14  established by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966).  *Sechrest*, 549 F.3d

15  at 805-07.

16       A nine-year-old girl named Tanya Wagner testified that she skated with Maggie and Carly

17  at Meadowood Mall on May 14, 1983.  Testimony of Tanya Wagner, Exhibit 43, pp. 56-66. Tanya

18  testified that after skating the three of them had lunch at a restaurant in the mall.  *Id*. at 58-59.  After

19  eating lunch, on their way back to the rink, the girls saw a man that Maggie said was her babysitter.

20  *Id*. at 59-60.  The man said to Maggie that they had better be going.  *Id*. at 60.  Tanya went back to

21  the rink to skate, and after she resumed skating, she saw Maggie come into the rink to get her ice

22  skates and skate guards, and then she saw Maggie leave the rink in a hurry.  *Id*. at 60, 66.  Tanya

23  identified Sechrest as the man she saw at the skating rink, whom Maggie described as her babysitter.

24  *Id*. at 62.

25       Anton Paul Sohn, M.D., testified that he performed the autopsies of Maggie and Carly.

26  Testimony of Anton Paul Sohn, M.D., Exhibit 43, pp. 73-100.  Dr. Sohn testified that, in his opinion,

Maggie and Carly both died of blunt force trauma to the head.  *Id*. at 76.  Dr. Sohn testified that, in his opinion, it was highly unlikely that Carly could have fallen and killed herself in the location where her body was found.  *Id*. at 80.  Dr. Sohn found that numerous blows were delivered to the right side of each girl's head.  *Id*. at 76, 81-86.  Dr. Sohn testified that each girl's skull had fractures that could have been caused by rocks, and also fractures that could have been caused by a shovel. *Id*.

Detective Don Means, of the Washoe County Sheriff's Department, testified that on June 14, 1983, he participated in a search, pursuant to a warrant, at Sechrest's residence. Testimony of Don Means, Exhibit 44, pp. 11-13.  The searching officers found three shovels.  *Id*. Robert Thompson, a technician from the Washoe County Crime Laboratory, testified that one of the shovels had human blood on it.  Testimony of Robert Thompson, Exhibit 42, pp. 16-18.

Thompson also testified that he found human hair on a dog leash that was found near Maggie's body.  *Id*. at 20.  He testified that one of the hairs on the dog leash was similar to a number of hairs found in Sechrest's car, but was not similar to the hair of Maggie and Carly, and was not similar to the hair of Daniel Sportsman.  *Id*. at 20-24, 31-34.  Thompson testified that another hair found on the dog leash was similar to Carly's hair.  *Id*. at 31-32.

Daniel Sportsman testified that he lived with Sechrest and his grandmother, Zella Weaver, and that he and Sechrest were lovers.  *See* Testimony of Daniel Franklin Sportsman, Exhibit 44, p. 36.  Sportsman testified that on May 14, 1983, Sechrest drove him to his work place and dropped him off at about 1:00 p.m.  *Id*. at 44-45.  He testified that Sechrest returned, and picked him up at around 4:00 or 4:30 p.m.  *Id*. at 46.  Sportsman testified that when he and Sechrest got home, Sechrest went into the bathroom and washed his pants in the sink, and then hung them out on a line to dry; Sportsman testified that this was highly unusual.  *Id*. at 47-48.  Sportsman testified that, later in the afternoon or evening on May 14, 1983, he learned that Zella had not been able to find Maggie when she went to pick her up at Meadowood.  *Id*. at 50.  Sportsman testified that on the following day, May 15, 1983, he and Sechrest went to the Schindlers' home and helped with the search for the

1    missing girls.  *Id*. at 50-51.  Sportsman testified that, around the time of the disappearance of Carly

2    and Maggie, Sechrest changed his appearance by cutting his hair and shaving.  *Id*. at 51-55.

3           Sportsman described himself as homosexual; he described Sechrest as bisexual.  *Id*. at 57-58.

4    Sportsman testified that he and Sechrest had engaged in acts of bondage.  *Id*. at 58-60.  He said that

5    on two occasions Sechrest had tied him up and had then masturbated and ejaculated.  *Id*.

6           Sportsman testified that Sechrest sometimes kept in his car the shovel that was found at his

7    residence with human blood on it.  *Id* at 60-61.  Sportsman testified that after the disappearance of

8    Maggie and Carly, he helped Sechrest clean Sechrest's car, and then Sechrest sold it.  *See id*. at

9    60-63; *see also* Exhibit 42, p. 64.  Sportsman testified that, around the time of the girls'

10   disappearance, Sechrest changed his hair style – he cut off his shoulder-length hair, and shaved off

11   some of his facial hair.  Exhibit 44, pp. 51-53.  Sportsman testified that on about June 13 or 14,

12   1983, Sechrest told him that he, Sechrest, "might have had something to do with" the disappearance

13   of Maggie and Carly.  *Id*. at 81-83.

14          Sechrest's stepfather testified that Sechrest had lived for a time in Lockwood, Nevada, and

15   that Sechrest was very familiar with the hills in the area where the missing girls' bodies were found.

16   Testimony of Jacob R. Presser, Exhibit 44, pp. 105-107.

17          Sechrest's position is that he did not have the requisite mental state for first degree murder,

18   because he was in a panic after Carly fell and hurt herself, and he did not intend to kill Carly and

19   Maggie.  *See* Reply, pp. 5-7.  The court finds that argument to be weak, in light of admissions made

20   by Sechrest in his statement to the police.

21          In Sechrest's statement, he described how he killed Carly and Maggie, and spoke about his

22   motivations, and about what he did immediately after killing the girls; in that statement, there is

23   ample evidence that he did, in fact, intend to kill Carly and Maggie, and that he killed them

24   intentionally, willfully, deliberately, and with premeditation.

25          The following is how Sechrest described his attack on Maggie, after Carly fell:

26

                                                    56

1    Q.    Okay, okay, then ... then what happened after that?  You probably were confused.

2    A.    I don't know.  I got ... I got mad at Maggie because she's blaming me for it.

3    Q.    Uh huh.

4    A.    I turned around and I zapped her because she started ... she started screaming
       because she ... I don't know ... I guess she realized what had happened or something ...
5      she ... she couldn't believe it but she realized it or something ... I don't know.  I slapped
       her ... and I knocked her down and ... she said that she was going to tell ... her mother,
6      and I was afraid of that ... was afraid to take ... that she would tell her mother ... afraid
       that I'd get blamed for something I didn't do.  And I had to keep her quiet and keep her
7      from telling anybody.

8    Q.    Did ah ... okay, what ... what happened next?

9    A.    I picked up a rock and I hit her.

10   Q.    Okay, was ah ... where did you hit her?

11   A.    I hit her on the head.

12   Q.    On the back?  You hit the back or the top or the ... do you know?

13   A.    Hit her on the back of the head.

14   Q.    What ... were ... were you ... or you weren't facing her now?

15   A.    I was facing her at first.

16   Q.    Uh huh.

17   A.    She started to run from me, and I hit her ... in the head.

18                              *    *    *

19   A.    Well like I say ... Maggie started to run, and I had to catch her.  I had to stop her
       before ...
20
     Q.    Oh, okay.
21
     A.    ... she could get very far.
22
     Q.    All right, ah ...
23
     A.    Because you know ... if she'd a went very much farther that people on the road
24     would have seen us.

25   Exhibit 146, pp. 10, 13.  Later Sechrest added the following:

26

                                    57

1

A.      Well, like I said, I was afraid that she would tell everything that was going on and that I would get, like I say, a murder rap.

2

Q.      Uhm-hm.

3

A.      And I was – I guess I was in a panic.

4

                                    *    *    *

5

A.      And I figured, you know, I'd have to shut her up and the only way to do that was, I would have to, you know –

6

7   Exhibit 147, p. 26.  Sechrest admitted that he hit Maggie in the head because he had to keep her

8   quiet and keep her from telling anybody what had happened, so he would not get in trouble for what

9   happened to Carly.  Sechrest spoke further about beating Maggie, making it quite clear that his intent

10  was to kill her:

11

Q.      How did you ... how did you strike here with that ... that ... rock?  One hand? Two hands?  I don't know.   Inaudible ... I don't know what ... what happened?

12

A.      I did it with one hand at first.

13

Q.      First?  Which hand was it?

14

A.      It was my right hand.

15

Q.      Okay, go ahead.

16

A.      And then ... *she wasn't dead.  So I hit her again, and I hit her again and again*.

17

18

Q.      How many times do you feel you hit her?

19

A.      I don't know.

20  *Id*. at 12 (emphasis added).  This is strong evidence that Sechrest did, in fact, intend to kill Maggie.

21  Regardless of what his intent was when these events began, by this point, when Sechrest was beating

22  Maggie on the head with a rock, according to his admission, he intended to kill her.  Sechrest

23  described in some detail how he beat Maggie:

24

Q.      (Eubanks) Now, we need to ask you, (inaudible) when Maggie was hit with the rock –

25

A.      Ah-huh.

26

58

1    Q.    – did she make any noise at all or –

2    A.    I hit her twice, three times, maybe even four times, I don't know.

3    Q.    First time she fell down, right?

4    A.    Yea, the first time she fell down.

5    Q.    And then when she was on the ground?

6    A.    Yeah.

7    Q.    You hit her?

8    A.    I hit her a couple more times.

9    Q.    Three or four more times?

10    A.    Yeah.

11    Q.    Whereabouts?

12    A.    Uh, mostly in the head, I guess.

13    Q.    (Means)   Side, the back?

14    A.    The back.

15    Q.    (Eubanks) Did you use one or both of your hands?

16    A.    I used both of my hands.

17    Q.    Did you hit as hard as you could?

18    A.    I don't know if it was as hard as I could or not but –

19    Q.    (Bogison) Is this an overhead swing or side hand or how did it?

20    A.    It was –

21    Q.    (Eubanks) Straight down?

22    A.    Yeah.

23    Exhibit 147, pp. 27-28.  The manner in which Sechrest beat Maggie speaks to his intent.

24    After he beat Maggie in the head with the rock, according to Sechrest, he returned to his

25    vehicle to get a shovel to bury the girls.  Exhibit 147, pp. 28-30.  He then described what happened

26    when he returned, with the shovel, to where Carly was laying on the ground:

59

Q.      – you did something to Carly when you came back though, did you hit her again?

A.      Yeah, I left – I came back with the shovel and Carly had rolled over on to her stomach.

Q.      Oh, so she was on her back at first –

A.      Uh-huh.

Q.      – and when you came back she'd rolled over on her stomach?

A.      Yeah.

Q.      Was she moving when you came up there?

A.      She wasn't movin' at all.

Q.      What'd you do?

A.      She was just laying there.

Q.      (Means) Could you see if she was breathing or anything?

A.      Uh, I couldn't – I couldn't tell, like I say I was, I was in a panic.  I was afraid.

Q.      (Eubanks) So what did you hit her with?

A.      I'm still afraid.

Q.      (Bogison) Ok, did you hit her again with the rock?

A.      Uh, I don't remember if I hit her with the rock or the shovel.

Q.      (Eubanks) Ok, where'd you hit her – regardless of what you used?

A.      In the head.

Q.      Whereabouts in the head?  She's laying on her stomach now, you say?

A.      Yeah.

Q.      What part of the head did you hit her in?

A.      I don't remember.

Q.      (Bogison) Was it an overhead swing, like the rock, or was it a side hit?

A.      I don't remember that either.

Q.      (Eubanks) How many times did you hit her, more than once?

60

1      A.     Maybe once, twice.

2      Q.     (Bogison) This is with the shovel?

3      A.     Yeah, this is with the shovel.

4      Q.     (Eubanks) And you used the flat end or the side of it?

5      A.     I don't remember, I think I hit her with the edge of it.

6  Exhibit 147, pp. 30-31.  So, here, Sechrest admitted that, because Carly had moved, and was apparently

7  still alive, he struck her with the shovel; plainly, he intended to kill her.

8      But even more directly, later in his statement, Sechrest admitted outright that he intended to kill

9  the girls:

10     Q.     When you went after Maggie, did you intend to kill her?

11     A.     *I did* after – after this thing with Carly, yes.

12     Q.     And the reason –

13     A.     To cover up –

14     Q.     The thing that happened to Carly.

15     A.     Yeah.

16     Q.     And when you hit –

17     A.     I was afraid.

18     Q.     When you went back to Carly with the shovel and the reason you hit her was for
what reason?

19

20     A.     Because she had moved, but at the same time when I got back there, she – like
I said, she had rolled over and uh, I don't know, I just figured she must not be dead you
know.

21

22     Q.     Was it to make –

23     A.     – but since I'd already done it to Maggie, *I had to finish everything*, you know.

24     Q.     (Eubanks) Ok, so might as well kill the other one so there's nobody left –

25     A.     Nobody, nobody left to get me in trouble.

26

1    Exhibit 147, pp. 57-58 (emphasis added).  Sechrest's statement, then, contains not only admissions that

2    he killed Carly and Maggie, and graphic descriptions of how he did so, but also unusually direct

3    admissions that he intended to kill them.

4        Moreover, immediately after killing the two girls, Sechrest's actions were inconsistent with

5    his claim that he killed in a panic, without intent.  According to Sechrest, after killing the girls, he

6    took the time to undress Maggie and attempt to have sexual intercourse with her dead body, and,

7    when he could not do that, he masturbated, to the point of ejaculation, and ejaculated onto Maggie's

8    bare stomach.  Exhibit 147, pp. 38-43.  It is unimaginable that reasonable jurors could find this to be

9    the conduct of a person who just killed the two little girls in a panic, without intent.

10       In light of the detailed admissions in Sechrest's statement, regarding the manner in which he

11   killed Carly and Maggie, regarding his intentions when he killed them, and regarding his actions

12   immediately after killing them, the question of his guilt, including the question whether he had the

13   intent to kill, was not a close question.  The evidence was overwhelming that Sechrest killed Carly

14   and Maggie intentionally, willfully, deliberately, and with premeditation.

15       Taking cumulatively the prosecutorial misconduct found by the court, in the discussions

16   above regarding Grounds 4A, 4D, 4E, 4F, and 4G,[6]  the court finds that the prosecutorial misconduct

17   did not have a substantial and injurious effect or influence in determining the jury's verdict.  It light

18   of the strong evidence of Sechrest's guilt, it is unimaginable that the guilty verdicts in this case

19   could have been affected, in any substantial way, by the scattered, and relatively benign, improper

20   arguments of the prosecutor described above.

21

22

23

24

25
          [6]  Here, only for purposes of analysis, the court includes in its cumulative error analysis the
26   prosecutorial misconduct described by the court in the discussions of Grounds 4D, 4E, and 4F, *supra*,
     although the claims of prosecutorial misconduct in those grounds for relief were beyond the scope of
     the remand, and were denied primarily on that basis.

1    <u>Ground 5</u>

2         In Ground 5, Sechrest claims that he "was denied a fair trial because of the Court's failure to

3    sua sponte object to the prosecutor's inflammatory and improper comments regarding possible

4    executive clemency after the imposition of the sentence." Fourth Amended Petition, p. 37.

5         This claim has been resolved, in Sechrest's favor, by the court of appeals. *Sechrest*, 549 F.3d

6    at 807-15.  The court will grant Sechrest habeas corpus relief, with respect to his death sentences, as

7    directed by the court of appeals.

8    <u>Ground 6</u>

9         In Ground 6, Sechrest claims that the trial court's "denial of the motion to appoint second

10   defense counsel for Mr. Sechrest was an abuse of discretion and denied Mr. Sechrest the effective

11   assistance of counsel and a fair trial in violation of the Sixth Amendment of the constitution."

12   Fourth Amended Petition, p. 38.

13        This claim, too, has been resolved.  This court addressed this claim, previously, and denied

14   it, *see* Order entered April 19, 2004 (docket #136), p. 23, and the court of appeals did not remand it

15   for further consideration.  *See Sechrest* 549 F.3d 789; *see also* Fourth Amended Petition, p. 38.

16   <u>Ground 7</u>

17        Ground 7 has two parts.  In Ground 7A, Sechrest claims that "[t]he trial court erred by

18   allowing into evidence Mr. Sechrest's admissions." Fourth Amended Petition, p. 39.  This

19   claim was  previously resolved by this court, in favor of the respondents.  *See* Order entered

20   April 19, 2004, pp. 23-35.  The court of appeals affirmed that ruling.  *See Sechrest*, 549 F.3d at

21   805-07; *see also* Fourth Amended Petition, p. 39.

22        In Ground 7B, Sechrest claims that "[t]he prosecutor committed misconduct by soliciting

23   testimony regarding Mr. Sechrest's invocation of his Fifth Amendment rights." Fourth Amended

24   Petition, p. 39.  Sechrest has withdrawn this claim.  *Id*.  The court will, therefore, deny habeas

25   corpus relief on Ground 7B.

26

63

1    Ground 8

2         In Ground 8, Sechrest claims that his constitutional rights were violated because the trial

3    court gave the following jury instruction, regarding the meaning of "reasonable doubt," in the guilt

4    phase of his trial:

> A reasonable doubt is one based on reason.  It is not mere possible doubt but is such a
> doubt as would govern or control a person in the more weighty affairs of life.  If the
> minds of the jurors, after the entire comparison and consideration of all the evidence,
> are in such a condition that they can say they feel an abiding conviction of the truth of
> the charge there is not a reasonable doubt.  Doubt to be reasonable must be actual, not
> mere possibility or speculation.

9    Fourth Amended Petition, p. 40.  Sechrest also makes this claim regarding the same instruction as

10   given in the penalty phase of his trial, but, with respect to the penalty phase of his trial, Sechrest

11   concedes that the claim is moot, in view of the ruling of the court of appeals in this case.  *Id.* (citing

12   *Sechrest*, 549 F.3d at 817).

13        The constitutionality of a reasonable doubt jury instruction depends on "'whether there is a

14   reasonable likelihood that the jury understood the instructions to allow conviction based on proof

15   insufficient to meet' the requirements of due process."  *Ramirez v. Hatcher*, 136 F.3d 1209, 1211

16   (9th Cir.1998) (quoting *Victor v. Nebraska*, 511 U.S. 1, 6 (1994)).  The instruction on reasonable

17   doubt used at Sechrest's trial was the same instruction challenged in *Ramirez*.  In *Ramirez*, the court

18   of appeals criticized the instruction, but nonetheless upheld it as constitutional.  *Ramirez*, 136 F.3d

19   at 1214-15; *see also Nevius v. McDaniel*, 218 F.3d 940, 944-45 (9th Cir. 2000).  Therefore, the law

20   in this circuit forecloses habeas relief based on that jury instruction.  *See* Reply, p. 42 (Sechrest

21   "recognizes that this Court is bound to follow *Ramirez*.").

22        In his reply, regarding Ground 8, Sechrest adds a further claim:  that his constitutional rights

23   were violated because the trial court gave a jury instruction defining first degree murder in a manner

24   that allowed for his conviction on bases not charged in the information.  *See* Reply, pp. 45-47.  This

25   claim was not asserted in Sechrest's second amended petition, and is, therefore, beyond the scope of

26   the remand.  *See* Second Amended Petition.  Furthermore, this claim is not even asserted in

64

Sechrest's fourth amended petition, the petition now before the court.  *See* Fourth Amended Petition.

Sechrest has improperly raised this additional ground for relief, for the first time, in his reply.  *See*

*Cacoperdo*, 37 F.3d at 507 ("A Traverse is not the proper pleading to raise additional grounds for

relief."); Rule 2(c)(1) of Rules Governing Section 2254 Cases (the habeas petition must "specify all

the grounds for relief available to the petitioner").  The court will not address this claim on its

merits.

The court will deny habeas corpus relief on Ground 8.

Ground 9

In Ground 9, Sechrest claims that the trial court "failed to instruct the jury that mitigation did

not have to be found unanimously by the jury."  Fourth Amended Petition, p. 43.

This claim relates only to Sechrest's death sentences, and not to the guilt phase of his trial;

therefore, in view of the court of appeals' ruling that Sechrest is entitled to habeas corpus relief with

regard to his death sentences, this claim is moot, and the court will, for that reason, deny relief on it.

*See Sechrest*, 549 F.3d at 805 n.5; *see also id*. at 817 n.16 (court of appeals declined to reach penalty

phase claim, having already concluded that Sechrest is entitled to resentencing); *see also* Fourth

Amended Petition, p. 43 (Sechrest concedes claim is moot).

Ground 10

In Ground 10, Sechrest claims that "[t]he attorney general committed prosecutorial

misconduct by failing to comply with this Court's order to deliver a copy of their entire file to

counsel upon the filing of the initial district court habeas petition."  Fourth Amended Petition, p. 44.

Sechrest withdraws this claim.  *See id*.  Therefore, the court will deny relief on it.

Ground 11

In Ground 11, Sechrest claims that his "constitutional rights were violated by the Nevada

Supreme Court's ruling that there was sufficient evidence to support a jury verdict that Mr. Sechrest

1    kidnaped the victims, a finding that was not supported by sufficient evidence at trial."  Fourth

2    Amended Petition, p. 45.

3            Sechrest withdraws this claim.  *See id*.  Therefore, the court will deny relief on it.

4            Ground 12

5            In Ground 12, Sechrest claims that he "was deprived of due process of the law, equal

6    protection and a reliable sentence by the introduction of evidence during the penalty phase of trial

7    that he had engaged in homosexuality."  Fourth Amended Petition, p. 46.

8            This claim relates only to the penalty phase of Sechrest's trial, and not to the guilt phase of

9    his trial; therefore, in view of the court of appeals' ruling that Sechrest is entitled to habeas corpus

10   relief with regard to his death sentences, this claim is moot, and the court will, for that reason, deny

11   relief on it.  *See Sechrest*, 549 F.3d at 805 n.5; *see also id*. at 817 n.16 (court of appeals declined to

12   reach penalty phase claim, having already concluded that Sechrest is entitled to resentencing); *see*

13   *also* Fourth Amended Petition, p. 46 (Sechrest concedes claim is moot).

14           Ground 13

15           In Ground 13, Sechrest claims that "[d]efense counsel's failure to effectively 'life qualify' all

16   jurors deprived Mr. Sechrest of a fair trial and effective assistance of counsel in violation of the

17   Fifth, Sixth, Eighth, and Fourteenth Amendments."  Fourth Amended Petition, p. 47.

18           This claim relates only to the penalty phase of Sechrest's trial, and not to the guilt phase of

19   his trial; therefore, in view of the court of appeals' ruling that Sechrest is entitled to habeas corpus

20   relief with regard to his death sentences, this claim is moot, and the court will, for that reason, deny

21   relief on it.  *See Sechrest*, 549 F.3d a 805 n.5; *see also id*. at 817 n.16 t(court of appeals declined to

22   reach penalty phase claim, having already concluded that Sechrest is entitled to resentencing); *see*

23   *also* Fourth Amended Petition, p. 47 (Sechrest concedes claim is moot).

24

25

26

1      Ground 14

2      In Ground 14, Sechrest claims that his constitutional rights were violated because his "capital

3  trial, sentencing and review on direct appeal were conducted before state judicial officers who failed

4  to conduct fair and adequate appellate review."  Fourth Amended Petition, p. 48.

5      The supporting facts alleged by Sechrest, in support of Ground 14, relate only to Sechrest's

6  death sentences.  *Id*.  Therefore, this claim relates only to the penalty phase of Sechrest's trial, and

7  not to the guilt phase of his trial; in view of the court of appeals' ruling that Sechrest is entitled to

8  habeas corpus relief with regard to his death sentences, this claim is moot, and the court will, for that

9  reason, deny relief on it.  *See Sechrest*, 549 F.3d a 805 n.5; *see also id*. at 817 n.16 (court of appeals

10  declined to reach penalty phase claim, having already concluded that Sechrest is entitled to

11  resentencing); *see also* Reply, p. 47 (Sechrest concedes claim is moot, and withdraws it).

12      Ground 15

13      In Ground 15, Sechrest claims that his constitutional rights were violated by the "combined

14  effect of all of the errors committed in the capital proceedings against Mr. Sechrest."  Fourth

15  Amended Petition, p. 49.

16      As the only error found by the court was prosecutorial misconduct, the analysis of this claim

17  is the same as the analysis in the discussion of Ground 4I.  Taking cumulatively the prosecutorial

18  misconduct found by the court – *see* discussion of Grounds 4A, 4D, 4E, 4F, and 4G  – the court

19  finds that the prosecutorial misconduct did not have a substantial and injurious effect or influence in

20  determining the jury's verdict, and that habeas corpus relief is not warranted.  *See* discussion of

21  Ground 4I, *supra*.

22      The court will deny habeas corpus relief with respect to Ground 15.

23      Ground 16

24      In Ground 16, Sechrest claims that his constitutional rights were violated "by the sentence of

25  death imposed by the Nevada judicial process."  Fourth Amended Petition, p. 50.

26

67

1    This claim relates only to the penalty phase of Sechrest's trial, and not to the guilt phase of

2    his trial; therefore, in view of the court of appeals' ruling that Sechrest is entitled to habeas corpus

3    relief with regard to his death sentences, this claim is moot, and the court will, for that reason, deny

4    relief on it.  *See Sechrest*, 549 F.3d at 805 n.5; *see also id*. at 817 n.16 (court of appeals declined to

5    reach penalty phase claim, having already concluded that Sechrest is entitled to resentencing); *see*

6    *also* Fourth Amended Petition, p. 50 (Sechrest concedes claim is moot).

7        Ground 17

8        In Ground 17, Sechrest claims that execution by lethal injection "would violate the

9    constitutional prohibition against cruel and unusual punishment."  Fourth Amended Petition, p. 51.

10       This claim also relates only to the penalty phase of Sechrest's trial, and not to the guilt phase

11   of his trial; therefore, in view of the court of appeals' ruling that Sechrest is entitled to habeas corpus

12   relief with regard to his death sentences, this claim is moot, and the court will, for that reason, deny

13   relief on it.  *See Sechrest*, 549 F.3d at 805 n.5; *see also id*. at 817 n.16 (court of appeals declined to

14   reach penalty phase claim, having already concluded that Sechrest is entitled to resentencing); *see*

15   *also* Fourth Amended Petition, p. 51 (Sechrest concedes claim is moot).

16       Ground 18

17       In Ground 18, Sechrest claims that he "was denied of his right to be free of cruel and unusual

18   punishment by the imposition of the sentence of death."  Fourth Amended Petition, p. 52.

19       This claim, too, relates only to the penalty phase of Sechrest's trial, and not to the guilt phase

20   of his trial; therefore, in view of the court of appeals' ruling that Sechrest is entitled to habeas corpus

21   relief with regard to his death sentences, this claim is moot, and the court will, for that reason, deny

22   relief on it.  *See Sechrest*, 549 F.3d at 805 n.5; *see also id*. at 817 n.16 (court of appeals declined to

23   reach penalty phase claim, having already concluded that Sechrest is entitled to resentencing); *see*

24   *also* Fourth Amended Petition, p. 52 (Sechrest concedes claim is moot).

25

26

Certificate of Appealability

The court has *sua sponte* evaluated Sechrest's claims, with regard to the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *see also* Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts; Fed. R. App. P. 22(b).

"A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). The Supreme Court has interpreted 28 U.S.C. §2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000).

Applying this standard, the court finds that reasonable jurists could debate the court's resolution of Ground 4A, and the court, therefore, grants Sechrest a certificate of appealability with respect to that claim.

**IT IS THEREFORE ORDERED** that respondents' "Motion to File a Pleading in Excess of Twenty Pages" (docket #202) is **GRANTED**. The court grants respondents leave of court to file their 28-page response to petitioner's reply (docket #203). As the response to reply has already been filed, the Clerk of the Court need take no action in this regard.

**IT IS FURTHER ORDERED** that petitioner's Motion for Evidentiary Hearing (docket #194) is **DENIED**.

**IT IS FURTHER ORDERED** that petitioner's fourth amended petition for writ of habeas corpus (docket #179) is **DENIED** with respect to Grounds 2A, 2B, 2C, 2D, 2E, 2F, 2G, 2H, 2I, 2J, 2K, 2L, 2M, 2N, 2O, 2P, 2Q, 2R, 3, 4A, 4B, 4C, 4D, 4E, 4F, 4G, 4H, 4I, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, and 18 of the fourth amended petition.

1        **IT IS FURTHER ORDERED** that petitioner's fourth amended petition for writ of habeas

2    corpus (docket #179) is **GRANTED** with respect to Grounds 1 and 5 of the fourth amended petition.

3        **IT IS FURTHER ORDERED** that within **120 days** of the date of entry of this order the

4    State of Nevada shall either (1) grant petitioner a new penalty phase trial, and initiate proceedings

5    relative to that new penalty phase trial, or (2) vacate petitioner's death sentences and impose upon

6    him non-capital sentences, consistent with law.

7        **IT IS FURTHER ORDERED** that petitioner is granted a certificate of appealability with

8    respect to Ground 4A of his fourth amended petition for writ of habeas corpus.

9        **IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly.

10

11        Dated this ___13th___ day of September, 2011.

12

13        *Edward C. Reed.*
                                              _____
14                                            UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26